**CONFIDENTIAL**

**EXHIBIT "A"**

November 8, 2010

Probe Resources, Ltd and subsidiaries
Att: Mr. Scott Broussard, President
24 Waterway, Suite 1450
The Woodlands, Texas 77380

Gentlemen:

The purpose of this letter is to confirm the understanding and agreement (the "Agreement") between Probe Resources, Ltd and its direct and indirect subsidiaries (collectively, the "Client" or "Companies") and Energy Spectrum Advisors, Inc. ("ESA") concerning the Client's engagement of ESA to provide the services of Mr. Coy Gallatin ("Mr. Gallatin") to the Client to provide turnaround management services (the "Services") to Client in connection with Client's businesses, the restructure of those businesses, and Client's financial affairs generally. This Agreement is effective on November 8, 2010 (the "Effective Date"). The Standard Terms and Conditions attached hereto as Exhibit "A" are also incorporated herein and form part of this Agreement.

The parties to this Agreement recognize the possibility that Client may seek protection under the United States Bankruptcy Code (the "Bankruptcy Code") under Chapter 7 or Chapter 11 thereof ("Chapter 7" or "Chapter 11", respectively), or that creditors may cause the Client to become involuntarily subject to the Bankruptcy Code, have sought to anticipate such events in drafting this Agreement and have incorporated negotiated terms in connection therewith.

1.  **Engagement, Status as Officer of the Companies**

ESA is hereby engaged to assist the Companies with their restructuring efforts with the objective of maximizing value with respect to the Companies (the "Engagement"). ESA will provide Mr. Gallatin to serve as the Client's Chief Restructuring Officer (the "CRO"), reporting directly to, and receiving his instructions directly from, the Board of Directors of Probe Resources, LTD or as applicable, the board of other of the Companies (the "Board"). The CRO, as well as any additional Hourly Temporary Staff, (as defined below), shall have such duties as the Board, or any committee of the Board to whom appropriate authority has been delegated by the Board (a "Committee"), may from time to time determine, and shall at all times report to and be subject to supervision by the Board and/or such Committee, as the case may be. In addition, the Board delegates to the CRO the authority to delegate duties to the Hourly Temporary Staff, and in such event, the Hourly Temporary Staff shall have such duties as the CRO shall delegate, together with any additional duties specifically delegated by the Board. For such purposes, the CRO and the Hourly Temporary Staff shall be agents, or as the case may be officers, of the Client or the individual Companies and not principals.

{00309607-2}
5961239v.4

In connection with the Engagement, Mr. Gallatin will work with the Companies, their advisors and, as appropriate, other stakeholders of the Companies, including but not limited to investors, lenders and other key creditor groups, in a manner consistent with the duties of the Chief Restructuring Officer of the Companies, to carry out the tasks required to perform the Engagement. During the Engagement, Gallatin will report to the Board. Although Mr. Gallatin will be elected serve as the Chief Restructuring Officer of the Company and in such other offices as the Board shall determine appropriate, he will not be elected to serve as a member of the Board. To the extent that ESA shall reasonably request, the Client shall assure that the Chief Restructuring Officer has such corporate and other authority as he shall reasonably request in connection with the Engagement. Notwithstanding the election of Mr. Gallatin as the Chief Restructuring Officer of the Companies, or to any other office or position of trust, the Board may remove Mr. Gallatin from all or any of such offices without notice, and Mr. Gallatin may similarly resign therefrom at his discretion.

Without limiting the generality of the foregoing, the Board expects ESA and Mr. Gallatin to use commercially reasonable efforts to cause the Company's management team, with the advice and assistance of its professional and under the direction of Mr. Gallatin as the Chief Restructuring Officer, to accomplish the following:

- Marshall the assets of the Client;

- Manage the operations of the Client using appropriate advisors;

- Reduce the Client's general and administrative expenses, including termination of employees, to the extent consistent with the goal of maximizing the value of Client;

- Assist in the development and implementation of a value recovery maximization program for the Client and their stakeholders, including the coordination of asset sales, proceeds, recovery and business wind down activities with the assistance of professional advisors and legal counsel;

- Manage the Client's restructuring process including, without limitation, assist in (a) developing possible restructuring plans or strategic alternatives for maximizing value for stakeholders, (b) negotiating with lenders, vendors, suppliers and other stakeholders in connection with a restructuring, including with respect to interim or other financing and any restructuring process, and (c) managing and overseeing 11 U.S.C §363 asset sales (if any) and proposing plans of reorganization or liquidation;

- Subsequent to the filing of any bankruptcy petitions, manage the cash and treasury functions of the Client, including, but not limited to, development/maintenance of short-term weekly cash use budgets, disbursement of cash and management of overall liquidity;

- Assist the Client in developing overall strategic and business plans including, but not limited to, analyzing alternative strategic plans and exit strategies, and evaluate the possible rejection of any executory contracts and unexpired leases;

- Assist in the evaluation and analysis of avoidance actions, including fraudulent and preferential transfers;

- Analyze creditor claims and work with the noticing agent, if any;

- Manage the Client's accounting and financial reporting functions;

- Manage the reporting activities pertaining to requirements of the Bankruptcy Court, the U.S. Trustee's office and any DIP lender, including, but not limited to, overseeing the preparation of the Client's Schedules and Statements of Financial Affairs;

In addition, Mr. Gallatin, for so long as he shall serve as Chief Restructuring Officer of the Client, shall:

- Serve as the Client's primary restructuring liaison with the business representatives and financial advisors to parties in interest, including, but not limited to, any Official Committee of Unsecured Creditors and pre-petition secured creditors;

- Manage and coordinate the efforts of the Client's management team and professionals in operating the businesses and developing such recovery maximization programs;

- Provide testimony in the Bankruptcy Court on matters within the CRO's areas of expertise or knowledge and consistent with the roles of the CRO and the Engagement team;

- Direct the efforts and activities of the Client and assist the Client's restructuring counsel, in connection with any 11 U.S.C. §363 asset sales, and, in connection with such sales, develop bid procedures, assist in negotiating "stalking horse" agreements, manage the marketing/solicitation process, assist in conducting auctions, and advise the board and the Client's restructuring counsel regarding determination of the "highest or best" offer;

- Manage the review and negotiation of all proposed capital market, merger, asset disposition or other financial transactions by the Client, determining the scope of the search for any such transactions and making recommendations to the board with respect thereto;

- Attend meetings of the Boards of each of the Clients;

- Deliver reports and present conclusions on each of the foregoing tasks to the Boards of directors of the Client; and

- Assist in such other matters that fall within the expertise of CRO and which are consistent with the roles of the CRO and the Engagement team, as may be mutually agreed upon in writing between the CRO and the board of the Client including serving in other officer positions.

## 2. Hourly Temporary Employees and Excluded Services

In addition to providing the CRO, ESA may provide the Client with additional staff (the "Hourly Temporary Staff" and, together with the CRO, the "Restructure Professionals"), subject to the terms and conditions of this Agreement. Persons who are Hourly Temporary Staff may provide Services on a full or part time basis, as the CRO shall direct, and may be removed, replaced or supplemented as the CRO, under the direction of the Board, may direct.

In the event that the engagement, or the continued engagement of ESA to perform the Services shall be subject to the approval of a United States Bankruptcy Court, Client agrees, at Client's expense and at the earliest practical time, to file an application (the "Application") to employ ESA as crisis and turnaround manager *nunc pro tunc* to the filing date pursuant to § 363 of the Bankruptcy Code.

The Services do not include (i) audit, legal, tax, environmental, accounting, actuarial, employee benefits, insurance advice or similar specialist and other professional services which are typically outsourced and which shall be obtained at Client's expense; or (ii) investment banking, including valuation or securities analysis, including advising any party or representation of the Client on the purchase, sale or exchange of securities or representation of the Client in securities transactions. Neither ESA nor Mr. Gallatin is a registered broker-dealer in any jurisdiction and neither will offer advice or opinion or any testimony on the valuation of securities or on any matter for which ESA is not appropriately licensed or accredited.

3. **Compensation to ESA**

Monthly Fee:

For services rendered in connection with this assignment, the Client agrees to pay ESA a non-refundable advisory fee of $25,000 per month for the services of the CRO. Any additional professionals added as Hourly Temporary Staff will be billed at their customary hourly rate as it exists from time to time. Fees are payable in advance and may be billed as frequently as weekly and will be billed not less frequently than monthly. When paid, fees are fully earned and non refundable

Expenses:

In addition to the fees outlined above, ESA will bill for reasonable, direct expenses incurred by it or Mr. Gallatin in connection with the Services. Not less frequently than monthly, ESA will provide the Client with reasonably detailed billing statements with respect to such expenses. Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the engagement such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the engagement. In addition, ESA shall be entitled to reimbursement of its legal fees and expenses incurred connection with (i) the preparation and negotiation of this Agreement, and (ii) consultation with counsel regarding the duties of Mr. Gallatin, the Temporary Hourly Staff or ESA arising in connection with the Services or the service of any of Mr. Gallatin as the CRO, or Mr. Gallatin or any Temporary Hourly Staff as an officer or the Client or in any other position of trust with respect thereto. Further, if ESA and/or any of its employees (other than CRO) are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to the Client, ESA will be compensated by Client at its then regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees and expenses) with respect thereto.

Cash on Account:

Immediately upon execution of this Agreement or as authorized by the Court, Client will fund the amount of $50,000 "on account," to be held as an "evergreen retainer" and as continuing

security for the payment of fees and expenses to ESA, with the unused portion of the retainer refunded to the Client at the conclusion of the engagement upon payment in full of all fees and expenses. Notwithstanding the foregoing, ESA may apply the cash held on account to any unpaid invoices in the event the Client fails to make timely payment. Subject to obtaining any required Bankruptcy Court approvals, the Client agrees to increase or supplement the Cash on Account from time to time during the course of the Engagement in such amounts as the Client and ESA mutually shall agree are reasonably necessary to a level that will be sufficient to fund all fees, charges, and disbursements reasonably anticipated to be incurred.

Invoicing and Payments:

ESA will send the Client periodic invoices for fees, charges and disbursements and, in certain circumstances, an invoice may be for estimated fees, charges and disbursements through a date certain. Each invoice constitutes a request for an interim payment against the fee to be determined at the conclusion of ESA's Services. The Client agrees upon submission of each such invoice to wire the invoice amount to ESA within two (2) business days of issuance of the invoice, without prejudice to the Client's right to dispute such invoice.

Payments to ESA shall be made by wire transfer to the following account:

Wire Instructions: (to be provided in a separate email by ESA)

Name of Bank
ABA # _____
Account # _____

Additional Provisions Regarding Fees:

a) The Client agrees to promptly notify ESA if the Client or any of its subsidiaries or affiliates extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of ESA involved in this Engagement and agrees that ESA has earned and is entitled to a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to ESA's former principal or employee that the Client or any of it subsidiaries or affiliates hires at any time up to one year subsequent to the date of the final invoice rendered by ESA with respect to this Engagement. For the purposes hereof, the parties recognize and agree that ESA's employees shall include the employees of Energy Spectrum Securities Corporation who are involved in rendering the Services.

b) ESA and Mr. Gallatin may, at their respective option, stop work or terminate the Agreement immediately upon the giving of written notice to the Client (i) if payments are not made in accordance with this Agreement, (ii) if an application for approval of this Agreement is not promptly submitted to a United States Bankruptcy Court having jurisdiction (the "Bankruptcy Court") with regard thereto or if submitted, is not approved on these terms or terms otherwise satisfactory to ESA and Mr. Gallatin, (iii) the Client shall become the subject of a Chapter 7 proceeding, (iv) if a Chapter 11 Trustee or other responsible person is appointed or (v) if Client or its agents shall engage in any act or

omission that ESA or Mr. Gallatin reasonably believes constitutes a material violation of applicable law or which could reasonably be expected to subject ESA, Mr. Gallatin or the ESA Parties to any liability under applicable law.

c)  (i) In the event that ESA is employed post-petition under § 363 of the Bankruptcy Code, ESA shall invoice the Client for its monthly fees every two weeks in advance and the Client shall pay ESA's invoices promptly within two (2) business days of invoice date. If, and only if, local Bankruptcy rules or the order approving the Application so require, ESA shall file with and serve on creditors entitled to notice thereof, a statement of staffing, professional services, compensation or expenses, on a quarterly basis, or as the Bankruptcy Court or rules may direct, and creditors and other parties in interest shall have an opportunity to object thereto and request a hearing thereon. (ii) In the event that ESA is employed post-petition as a "professional person" pursuant to § 327 of the Bankruptcy Code, Bankruptcy Court approval will generally be required to pay ESA's fees and expenses for Services rendered post-petition. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. The Client agrees that in this situation it will, at the Client's expense, request the Bankruptcy Court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the Bankruptcy Court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our Engagement.

d)  Any unpaid post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Client understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Client shall nevertheless remain liable for payment of court approved post-petition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. §503(b)(l). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. §1129(a)(9)(A), that a plan cannot be confirmed unless administrative claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment). It is agreed and understood that the unused portion, if any, of the Cash on Account shall be held by us and applied against the final fee application filed and approved by the court.

e)  Client agrees that Mr. Gallatin and the Temporary Hourly Staff are not employees of the Client, that they shall not receive a W-2 from the Client for any fees earned under this engagement, and that such fees are not subject to any form of withholding by the Client. The Client shall provide ESA a standard form 1099 on request for fees earned under this Engagement.

f)  Copies of Invoices shall be sent by facsimile or email as follows:

<u>To the Client at:</u>

> Probe Resources, Ltd and subsidiaries
> 24 Waterway, Suite 1450
> The Woodlands, Texas 77380
>
> Attention: President

## 4. Term

This Agreement is terminable by either of the Client or ESA or Mr. Gallatin, in their respective sole discretion, at any time upon the giving of thirty (30) days written notice to the other parties. Upon such termination by the Client (the "Termination Date"), ESA and Mr. Gallatin shall cease work and the Client shall have no further obligation for fees and expenses of ESA arising or incurred after the Termination Date, *provided, however,* that, notwithstanding any termination by Client or by ESA or Mr. Gallatin in the circumstances described in paragraph (b) of "Additional Provisions Regarding Fees", the Client shall reimburse ESA for its out-of-pocket expenses (the "Termination Expenses") incurred in connection with commitments made by ESA prior to the Termination Date with respect to advance travel arrangements reasonably incurred, to the extent ESA is unable to obtain refunds of such expenses. ESA shall provide the Client with reasonable documentation to substantiate all Termination Expenses for which payment is requested.

No termination of this Agreement by any party shall relieve Client of its obligation to indemnify the ESA Parties under Section 7 below.

## 5. Availability of Information, Resources

In connection with ESA's activities on the Client's behalf, the Client agrees (i) to furnish ESA with all information and data concerning the business and operations of the Client which ESA reasonably requests, and (ii) to provide ESA with reasonable access to the Client's officers, directors, partners, employees, retained consultants, independent accountants, and legal counsel. ESA shall not be responsible for the truth or accuracy of materials and information received by ESA under this agreement, and shall be under no obligation to investigate or confirm any information provided.

Client shall be responsible for assuring that it has adequate personnel and other resources, including available working capital, facilities, data processing equipment, professional advisors and the like, to allow the performance in a businesslike manner of the tasks contemplated as part of the Engagement, and it shall be a condition of ESA's obligations hereunder that such resources are reasonably available and under ESA's and the CRO's direction.

## 6. Notices

Notices under this Agreement to the Client shall be provided as set forth in paragraph 2(f).

Notices to ESA shall be to:

> Energy Spectrum Advisors, Inc.

5956 Sherry Lane, Suite 900
Dallas, Texas 75225
Attn: James P. Benson, Jr.

Notices shall be provided by overnight delivery and shall be deemed effective on the date of actual receipt.

7. **Standard of Care, Indemnification.**

ESA and Mr. Gallatin shall render the Services in a professional manner, consistent with its customary commercial practices. Mr. Gallatin shall devote such time and attention to the Engagement, and shall make himself available at such times and places as he shall deem appropriate in connection therewith. Mr. Gallatin and the ESA Parties shall be entitled to the limitations of liability, exculpations and indemnities available to officers of Client, to the extent that they are performing such functions or in such offices, and Client shall use commercially reasonable efforts to include such ESA Parties as insureds under its existing and future policies of insurance insuring officers or directors.

(i) Specific Provisions regarding Indemnification.

a) Each party agrees to notify promptly the other of any claim or judgment to which these indemnification provisions may apply. Further, the parties agree not to settle any claim to which these indemnity provisions may apply or in which the parties are both named, or are reasonably threatened to be named, without the prior written consent of the other party, which consent will not be unreasonably withheld. Neither party will be liable to the other party for special, incidental, consequential or punitive damages. These indemnification provisions will survive the termination or expiration of this Agreement.

b) In addition to any other indemnification or insurance available, Client agrees to directly indemnify Mr. Gallatin, the Temporary Hourly Staff, ESA, and ESA's parent and subsidiary entities and their respective directors, officers, employees, agents, and controlling persons (Mr. Gallatin, the Temporary Hourly Staff, ESA and such other person being referred to herein as the "ESA Parties"), on a current basis from and against any and all losses, claims, damages, and liabilities (including amounts paid for attorneys fees or in settlement), whether joint or several, to which such ESA Party may become subject, that arise out of or relate, to the extent so arising or related, this Agreement, the engagement of ESA or Mr. Gallatin, or the performance of the Services contemplated by this Agreement (whether performed or occurring before or after the date of the Agreement), **INCLUDING THOSE LOSSES, CLAIMS, DAMAGES, AND LIABILITIES ARISING FROM THE SOLE, CONTRIBUTORY OR CONCURRENT NEGLIGENCE OR STRICT LIABILITY** of such ESA Party, but not including claims brought by ESA itself, claims by Client for a breach of this Agreement, claims for which ESA is fully and finally adjudged to have engaged in fraud or criminal conduct, gross negligence or willful misconduct, and claims for which indemnification is prohibited by applicable law (all claims for which indemnification by Client is required shall be referred to collectively as "Claims"). Client further agrees to advance all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred by an ESA Party in connection with the investigation of, preparation for, or defense of any pending or threatened Claim or any action

or proceeding arising therefrom, to the extent the ESA Party is a party, witness or other participant or is threatened to be made a party, witness, or other participant to such Claim or proceeding. Client may require a commitment from the ESA Party to repay such expenses, and ESA hereby guarantees such repayment, which commitment shall be applicable in the event the Claim or proceeding is subsequently determined not to be subject to indemnification. Client also agrees that, to the fullest extent permitted by law, no ESA Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Client or its security holders or creditors in connection with any Claim. The foregoing indemnity shall not limit indemnities available any ESA Party under the certificate of incorporation, bylaws, company agreement or similar constituent document of Client or its affiliates.

If the indemnification of an ESA Party provided for in this Agreement is for any reason held unenforceable and Client is deemed to be jointly liable with the ESA Party for the losses, claims, damages, or liabilities for which indemnification is unenforceable, Client agrees to contribute to the payment of such losses, claims, or liabilities (i) in such proportion as is appropriate to reflect the relative benefits to Client, on the one hand, and ESA, on the other hand, of the transactions described in this Agreement (whether or not any such transactions are consummated) or (ii) if (but only if) the allocation provided for in clause (i) is for any reason held unenforceable, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of Client, on the one hand, and ESA, on the other hand, as well as any other relevant equitable considerations.

8. **Miscellaneous**

This Agreement: represents the entire understanding of the parties hereto and supersedes any and all other prior agreements among the parties regarding the subject matter hereof; shall be binding upon and inure to the benefit of the parties and their respective heirs, representatives, successors and assigns; may be executed by facsimile (followed by originals sent via regular mail), and in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument; and may not be waived, modified or amended unless in writing and signed by a representative of the Client and _____. The provisions of this Agreement shall be severable. No failure to delay in exercising any right, power or privilege related hereto, or any single or partial exercise thereof, shall operate as a waiver thereof.

If this letter correctly sets forth our understanding, please so acknowledge by signing below and returning a signed copy of this letter to us.

                                    Very truly yours,

                                    ENERGY SPECTRUM ADVISORS, INC.

                                    By:_____
                                    Name: _____
                                    Title: _____

ACCEPTED AND AGREED this _____ day of November, 2010.

Probe Resources, Ltd on behalf of itself and its subsidiaries

By: _____
Name: Scott Broussard
Title: President
Date: Effective as of November 8, 2010

## EXHIBIT "A"

## ENERGY SPECTRUM ADVISORS, INC.

## STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which ESA will provide the Services and is intended to be attached to a letter of engagement with Probe Resources, LTD and subsidiaries ("Client") dated as of November 8, 2010 (collectively, such letter agreement and these Standard Terms and Conditions are the "Agreement"). This Agreement forms the entire agreement between ESA and Client relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Agreement, including these Standard Terms and Conditions, are included to make it easier to read but do not form part of the Agreement. Capitalized terms not otherwise defined herein, shall have the definitions assigned in the letter agreement.

1. **Reports and Advice**

1.1 **Use and purpose of advice and reports** – Any advice given or report issued by ESA is provided solely for Client's use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, Client shall not provide any advice given or report issued by ESA to any third party, or refer to ESA or the Services, without ESA's prior written consent. In no event, regardless of whether consent has been provided, shall ESA assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

2. **Information and Assistance**

2.1 **Provision of information and assistance** – ESA's performance of the Services is dependent upon Client providing such information and assistance as ESA may reasonably require from time to time, including but not limited to the provision of adequate personnel and material resources necessary to the successful performance of the Engagement.

2.2 **Punctual and accurate information** – Client shall use reasonable skill, care and attention to ensure that all information ESA may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required. Client shall also notify ESA if Client subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3 **No assurance on financial data** – While ESA's work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. Client management will be responsible for any and all financial information they provide to ESA during the course of this Engagement, and ESA will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause ESA's advice to be limited in certain respects based upon, among other

{00309607-2}
5961239v.4

matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, ESA will not express any opinion or other form of assurance on financial statements of the Client.

2.4 **Prospective financial information**—In the event the Services involve prospective financial information, ESA's work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. ESA will take no responsibility for the achievability of results or events projected or anticipated by the management of the Client.

3. **Additional Services**

3.1 **Responsibility for other parties** – Client shall be solely responsible for the work and fees of any other party engaged by Client to provide services in connection with the Engagement regardless of whether such party was introduced to Client by ESA. Except as provided in this Agreement, ESA will not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.

3.2 **Advisory services** – Client agrees that the Engagement shall not limit ESA's right to provide or seek to provide other services to Client or its affiliates, subject in any event to applicable law. No ESA Party shall have any duty to refrain from recommending ESA as a provider of services, nor shall any ESA Party have any duty to assess in a competitive situation, the services or potential services of ESA and any third party.

4. **Confidentiality**

4.1 **Restrictions on confidential information** – Both parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's consent. Confidential information shall not include information that:

   4.1.1 is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

   4.1.2 is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

   4.1.3 is or has been independently developed by the recipient.

4.2 **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, either party will be entitled to disclose confidential information of the other to a third party to the extent that this is required by valid legal process, provided that (and without

{00309607-2}
5961239v.4

breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other party.

4.3  **Citation of engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent this Engagement is or becomes known to the public, ESA may cite the performance of the Services to its clients and prospective clients as an indication of our experience.

4.4  **Maintenance of workpapers** – Notwithstanding the above, ESA may keep one archival set of its working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

5.  **Current on Certain Obligations** – In connection with this engagement Client represents to ESA and Mr. Gallatin that Client (i) it has timely remitted and will continue to timely remit to the appropriate beneficiaries all employee source deductions, payroll and other taxes, benefits deductions, and contribution to employee benefit programs, and has timely collected and remitted sales and use and other similar taxes to appropriate collecting authorities and will continue timely to do so; (ii) there is no litigation or other proceeding pending, or to knowledge of Client, threatened (nor is Client aware of facts that could give rise to such), in each case that seeks or could give rise to personal liability of officers and directors of Client; and (iii) Client has been in continuing compliance with all applicable laws and regulations concerning the discharge, treatment, storage, transportation or use of hazardous materials and is aware of no facts or circumstances that could give rise to Client responsibility or liability under such laws and regulations.

6.  **Limitation of Liability** – Client agrees that no ESA Party shall have any liability as a result of Client's retention of ESA, the execution and delivery of this Agreement, the provision of Services or other matters relating to or arising from the Engagement, other than liabilities that shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the indemnified ESA Party in respect of whom such liability is asserted. In no event shall ESA be liable for consequential, special or punitive damages, even if it shall have been advised of the likelihood of same. **THE FOREGOING LIMITATION OF LIABILITY MAY HAVE THE EFFECT OF LIMITING A PERSON OR ENTITIES LIABILITY FOR ITS OWN NEGLIGENCE.**

7.  **Governing Law and Jurisdiction** – The Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas, without giving effect to the choice of law provisions thereof. The Bankruptcy Court having jurisdiction over the Client's Bankruptcy case shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Agreement and any matter arising from it. The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.

8.  **Conflict of Terms** – If any provision of these Standard Terms and Conditions shall conflict with a provision or provisions of similar intent in the letter agreement to which

these Standard Terms and Conditions are attached, the terms in the letter agreement shall control.

---

*Confirmation of Standard Terms and Conditions*

We agree to engage Energy Spectrum Advisors, Inc and Mr. Coy Gallatin _____ upon the terms set forth in these Standard Terms and Conditions as outlined above.

                                                Probe Resources, Ltd on behalf of itself and subsidiaries

                                                By:_____
                                                Scott Broussard, President
                                                Date: As of November 8, 2010

{00309607-2}
5961239v.4