ENTERED
12/07/2010

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PROBE RESOURCES US LTD. | § | CASE NO. 10-40395 |
| | § | |
| Debtors. | § | JOINT ADMINISTRATION REQUESTED |
| | § | (Chapter 11) |
| | § | |
| | § | |
| | § | |

*Amended*

## AGREED INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL GRANTING ADEQUATE PROTECTION AND SCHEDULING A FINAL HEARING ON THE MOTION

Having considered the *Motion For Order Authorizing the Debtors to: (I) Enter into Post-Petition Financing and Obtain Post-Petition Financing; and Emergency Motion (II) Authorizing Use of Cash Collateral; (III) Granting Security Interest and Superpriority Claims; (IV) Granting Adequate Protection; (V) Modifying Automatic Stay; and (IV) Scheduling a Final Hearing on the Motion* (the "Motion"); the *Declaration of Coy Gallatin in Support of Voluntary Petitions, First Day Motions, Designation as Complex Bankruptcy Case*, (the "CRO Declaration") and the evidence and arguments presented at the hearing, the Court finds that: (a) jurisdiction over the

matters in the Motion is proper pursuant to 28 U.S.C. §§1334 and 157; (b) venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409; (c) proper and adequate notice of the Motion has been provided and no further notice is needed; (d) the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest; and (e) good and sufficient cause exists for granting certain of the relief requested in the Motion. Accordingly, **IT IS HEREBY FOUND THAT:**

A.     On November 16, 2010 (the "Petition Date") PROBE ST 214 LTD, PROBE RESOURCES US LTD., PROBE HIGH ISLAND 115 LTD., and PROBE RESOURCES ENERGY MARKETING US LTD. (collectively, the "Debtors" or "Probe"), filed voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

B.     On Monday, November 29, 2010, this Court conducted the interim hearing on the Motion and pronounced interim approval of the Motion as set forth herein.

C.     An official committee of unsecured creditors (the "Committee") has not been appointed in this Case.

*Pre-Petition Debt*

**Original Debt**

D.     On February 19, 2009, The K2 Principal Fund L.P. ("K2") and PROBE RESOURCES LTD. ("Probe Parent"),[1] entered into a term credit facility agreement in the principal amount of $8,500,000 (the "Original Credit Agreement"). The current amount outstanding as of the Petition Date under the Original Credit Agreement is approximately $4,659,154 plus fees, interest and attorney's fees accruing pursuant to the terms of the Original Credit Agreement (the "Original K2 Debt"). K2 is secured by liens on all or substantially all of Probe Parent property, which consists primarily of equity interests in the Debtors.

---

[1] Probe Parent is a British Columbia corporation and the owner of all the equity in the other Debtors herein.

E.     PROBE ST 214 LTD. ("Probe 214"), a Nevada corporation, owns interests in various offshore oil and gas properties in the Gulf of Mexico including those generally known as: OCS-G 24979, Block 214 South Timbalier Area (the "ST 214 Lease"); OCS-G 24791, Block 36 East Cameron Area (the "EC 36 Lease"); and OCS-G 24805, Block 246 East Cameron Area (the "EC 246 Lease").  Probe 214 is the beneficiary of the loan proceeds disbursed pursuant to the Original Credit Agreement.

F.     Probe 214 guaranteed payment of the Original K2 Debt through a written guarantee (the "Probe 214 Guarantee") dated February 19, 2009 and granted a lien to K2 to secure payment of the Original K2 Debt through (a) a Security Agreement dated February 19, 2009 and registered under the Uniform Commercial Code (Nevada) on February 20, 2009 in favor of K2 on all of the assets and undertakings of Probe 214, (b) a Mortgage dated February 19, 2009 and recorded on February 23, 2009 in Terrebonne Parish, Lafourche Parish, and Cameron Parish, Louisiana, and (c) deposit account control agreements covering all deposit accounts (collectively and together with the Original Credit Agreement, the Probe 214 Guarantee and all related loan documents, the "Original Credit Loan Documents").  The Original K2 Debt is secured by all assets of Probe 214.

### K2-TEC Debt

G.     On January 20, 2009, Third Eye Capital Corporation ("TEC")[2] and Probe Parent entered into that certain Note and Warrant Purchase Agreement (the "Note Purchase Agreement") for the issuance of senior secured notes in the aggregate principal amount of $10,000,000 and certain warrants for common shares in Probe Parent.  The current amount outstanding under the Note Purchase Agreement as of the Petition Date is approximately $8,325,072 plus fees, interest and attorney's fees accruing pursuant to the terms of the Note

---

[2] There is no affiliation between TEC and K2.

Purchase Agreement and related loan documentation (the "K2-TEC Debt"). The K2-TEC Debt is secured by liens on all or substantially all of Probe's property, pursuant to (a) a Security Agreement dated January 20, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (British Columbia) on January 19, 2009 in favor of TEC and (b) a Blocked Account Agreement dated February 3, 2009 (collectively and together with the Note Purchase Agreement and all related loan documents, the "K2-TEC Loan Documents").

### Probe 115 Guarantee

H.      PROBE HIGH ISLAND 115 LTD. ("Probe 115"), a Nevada corporation, owns an interest in an offshore oil and gas property generally known as: OCS-G 18936, Block 115 High Island Area (the "HI 115 Lease"). Probe 115 guaranteed payment of the K2-TEC Debt through a Secured Continuing Unconditional Guaranty (the "Probe 115 Guarantee") dated January 20, 2009 and granted a lien to TEC to secure payment of the K2-TEC Debt through (a) a Security Agreement dated January 22, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (Nevada) on January 21, 2009 in favor of TEC, (b) a Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated January 20, 2009 and recorded in Jefferson County, Texas, covering the HI 115 Lease, and (c) a Deposit Account Control Agreement. The K2-TEC Debt is secured by all assets of Probe 115 (collectively and together with the Probe 115 Guarantee and all related documents, the "Probe 115 Guarantee Documents").

### Probe US Guarantee

I.      PROBE RESOURCES US LTD. ("Probe US"), a Nevada corporation, is the operator of properties owned by Probe 214 and owns interests in various offshore oil and gas properties in the Gulf of Mexico including those generally known as: OCS-G 32214, Block 198

Case 10-40395   Document 57   Filed in TXSB on 12/01/2010   Page 5 of 31

South Timbalier Area (the "ST 198 Lease"); OCS-G 25933, 37 Block East Cameron Area (the "EC 37 Lease"); and OCS-G 31329 Block 20 Vermilion Area (the "Vermilion 20 Lease").

J.      Probe US guaranteed payment of the K2-TEC Debt through a Secured Continuing Unconditional Guaranty (the "Probe US Guarantee") dated January 22, 2009 and granted a lien to TEC to secure payment of the K2-TEC Debt through (a) a Security Agreement dated January 22, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (Nevada) on January 21, 2009 in favor of TEC, (b) an Act of Mortgage and Security Agreement Securing Future Obligations dated January 21, 2009 and recorded in Vermilion Parish, Terrebonne Parish, Lafourche Parish, and Cameron Parish, Louisiana, covering the EC 37 Lease and the Vermilion 20 Lease, among other mortgaged property and (c) a Deposit Account Control Agreement.  The K2-TEC Debt is secured by all assets of Probe US except for the ST 198 Lease (collectively and together with the Probe US Guarantee and all related documents, the "Probe US Guarantee Documents").

### Probe 214 TEC Guarantee

K.      Probe 214 guaranteed payment of the K2-TEC Debt through a Secured Continuing Unconditional Guaranty (the "Probe 214 TEC Guarantee") dated February 19, 2009 and granted a lien to TEC to secure payment of the TEC Debt through (a) a Security Agreement dated February 19, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (Nevada) on February 23, 2009 in favor of TEC, (b) an Act of Mortgage and Security Agreement Securing Future Obligations dated February 19, 2009 and recorded in Vermilion Parish, Terrebonne Parish, Lafourche Parish, and Cameron Parish, Louisiana, covering the ST 214 Lease, the EC 36 Lease and the EC 246 Lease.  The K2-TEC Debt is secured by all assets of Probe 214; provided however, all liens in favor of TEC are subject to that certain Intercreditor Agreement (the "Intercreditor Agreement") dated February 19, 2009, among

TEC, Probe Parent and K2, which subordinates the TEC liens to certain liens of K2 (collectively and together with the Probe 214 TEC Guarantee and all related documents, the "Probe 214 TEC Guarantee Documents").

### Probe Energy Guarantee

L.      Probe Resources Energy Marketing US Ltd. ("Probe Energy") guaranteed payment of the K2-TEC Debt through a Secured Continuing Unconditional Guaranty (the "Probe Energy Guarantee") dated January 22, 2009 and granted a lien to TEC to secure payment of the K2-TEC Debt through a Security Agreement dated January 22, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (Nevada) on January 21, 2009 (collectively, and together with the Probe Energy Guarantee and all related documents, the "Probe Energy Guarantee Documents").  The K2-TEC Debt is secured by all assets of Probe Energy.

### Assignment of K2-TEC Debt to K2

M.      By Assignment Agreement dated August 10, 2009 (the "K2-TEC Debt Assignment"), TEC assigned the K2-TEC Debt to K2, together with all liens securing the same. In connection with the K2-TEC Debt Assignment, TEC recorded an Assignment of Notes and Liens dated August 10, 2010 and a Correction Assignment of Notes and Liens in each applicable county and parish (collectively, and together with the K2-TEC Debt Assignment and related documents, the "K2-TEC Debt Assignment Documents").  Accordingly, K2 is the current owner and holder of the K2-TEC Debt.

### The DRA

N.      Pursuant to that certain Debt Restructuring Agreement (the "DRA") effective August 31, 2009, Jeffery A. Compton (the "Creditors' Agent") in his capacity as creditors' agent holds a senior security interest in the ST 198 Lease. The ST 198 Lease, however, is not currently

producing. The DRA was the product of numerous meetings and negotiations between the Debtors and their creditors. The DRA created a litigation moratorium (except for actions required to perfect liens under state law) and allowed the Debtors an opportunity to pay their creditors and continue to operate in the ordinary course of business subject to the terms of the DRA. In connection with the DRA: (a) all creditors reserved any rights under applicable state law; (b) the Debtors agreed to cause all production revenues (excluding production from the HI 115 Lease) to be deposited by the production purchasers into blocked accounts for the benefit of creditors; (c) the Creditors' Agent was appointed to disburse monthly production revenue in accordance with a structure negotiated under the DRA and monitor compliance with a pre-established general and administrative expense budget; (d) the Creditors' Agent reported to a restructure committee of creditors (the "Restructure Committee") appointed under the DRA; and (e) a lien (subordinate to any and all existing liens) was granted to the creditors' agent, for the benefit of the creditors to the DRA (the "Joining Creditors"), to secure performance under the DRA. All creditors reserved all rights vis-à-vis each other under applicable state law. Distributions commenced under the DRA on or about September 4, 2009.

### The First Amended DRA and the 36/37 Financing

O.      Effective November 10, 2009, Probe US, Probe 214, the Joining Creditors, the Restructure Committee, and the Creditors' Agent, entered into the First Amendment to Debt Restructuring Agreement (the "First Amended DRA"), which facilitated the provision of financing in the principal amount of $9.25 million (the "36/37 Financing") to the Debtors to complete the development of the EC 36 A-1 well and the EC 37 A-2 well. The First Amended DRA, *inter alia*, created a framework to support the 36/37 Financing and a mechanism to repay the associated debt from production proceeds. Under the 36/37 Financing and security documents (the "36/37 Loan Documents"), K2 was granted liens on all of Probe US and Probe

214's assets. The lien previously granted to the Creditors' Agent on the EC 36 Lease and the EC 37 Lease was subordinated to K2's liens and rights in those properties. The 36/37 Financing closed on or about November 12, 2009.

P.      The Debtors' completion operations relating to the 36/37 Financing were largely unsuccessful and did not produce the results that management projected. Among other things, a mechanical issue arose in connection with the EC 37 A-2 well completion which caused excessive water production. The current amount owed on account of the 36/37 Financing as of the Petition Date is approximately $10,965,178.

### The 246 Financing and the Second Amended DRA

Q.      The primary term of the EC 246 Lease has expired and the lease is currently held by a "Suspension of Operations" and a related development plan approved by the Bureau of Ocean Energy Management, Regulation and Enforcement (formerly the Minerals Management Service) (the "Bureau"). In order to maintain the lease, Probe is required to achieve certain milestones. Effective May 19, 2010, Probe US, Probe 214, the Joining Creditors, the Restructure Committee, and the Creditors' Agent, entered into the Second Amendment to Debt Restructuring Agreement (the "Second Amended DRA"), which was intended to facilitate the provision of financing (the "246 Financing") by K2 to the Debtors in the aggregate amount of approximately $11.1 million for the completion of the EC 246 #2 well. The 246 Financing loan and security documents (the "246 Loan Documents") granted liens to K2 on the EC 246 Lease and subordinated the liens of the Creditors' Agent with respect to the EC 246 Lease. On May 27, 2010, K2 funded the first tranche (Tranche A in the net amount of $1,575,000) of the EC 246 Financing, which the Debtors represented was necessary in order to meet a bonding deadline imposed under the Bureau's development plan. The Debtors subsequently advised that they

received an extension of deadlines related to the Suspension of Operations, but they were required to continue completion operations on the EC 246#2 by December 31, 2010 or the EC 246 Lease may be lost.  K2 did not fund the second tranche (Tranche B) of the EC 246 Financing due to failed conditions precedent under the loan documents and the Debtors' failure to present an acceptable out-of-court reorganization plan to restructure the companies' obligations.   The current amount outstanding under the 246 Financing as of the Petition Date is approximately $1,899,301.

R.     The Probe US and Probe 214 defaulted under the Second Amended DRA on September 15, 2010, by failing to repay the debts due and owing to the Joining Creditors.  The Creditors' Agent sent a notice of default to Probe US and Probe 214, and the moratorium under the DRA, as amended, terminated.

*Pre-Petition Loan Documents*

S.     Pursuant to the Original Credit Loan Documents, the K2-TEC Loan Documents, the Probe US Guarantee Documents, the Probe 214 Guarantee Documents, the Probe 115 Guarantee Documents, the Probe Energy Guarantee Documents, and the K2-TEC Debt Assignment Documents, the 36/37 Loan Documents and the 246 Loan Documents (collectively, the "Pre-Petition Loan Documents"), K2 holds a senior secured first priority position in all of the Debtors' assets save the ST 198 Lease.  K2 holds a subordinate lien on the ST 198 Lease to secure the amounts owed in connection with the 36/37 Financing.  The Debtors retain true and correct copies of the Pre-Petition Loan Documents and will provide copies to interested parties upon request.  The Debtors stipulate that the Pre-Petition Loan Documents are genuine, valid, existing, and legally enforceable.

*Pre-Petition Claims*

T.      As of the Petition Date, the Debtors stipulate that, pursuant to the Pre-Petition

Loan Documents and applicable law, K2 holds valid, enforceable, and allowable claims (the

"Pre-Petition Claims") against the Debtors, in an aggregate amount equal to at least

$25,848,705.07 (the "Pre-Petition Indebtedness") plus any and all other fees, cost, expenses,

charges, other debts or obligations of the Debtors to K2 under the Pre-Petition Loan Documents

and applicable law.   Further, as of the Petition Date, the Debtors stipulate that K2 holds claims

as assignee of certain Joining Creditors under the DRA.   The Debtors' stipulate that K2 holds

valid, enforceable and allowable claims in addition to the Pre-Petition Claims and the Pre-

Petition Indebtedness, in the amount of at least $947,343 plus any and all other fees, costs and

interest owed under applicable law.   The Debtors' stipulate that, during the period immediately

leading up to the Debtors' Petition Date, K2 advanced amounts to cover certain expenses (in the

amount of $404,355), which were critical to the Debtors' continued operations and critical and

necessary to preserve the value of the Debtors' estates.   The Debtors' further stipulate the K2

advanced $58,616.23 on a post-petition basis, to cover the payroll costs of the Debtors'

necessary employees and such advances were critical and necessary to the Debtors' continued

operations and to preserve the value of the Debtors' estates.

U.      The Debtors stipulate that the Pre-Petition Claims, Pre-Petition Indebtedness and

other indebtedness referenced above constitute allowed, legal, valid, binding, enforceable, and

non-avoidable obligations of the Debtors, and shall not be subject to any offset, defense,

counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code

or any other applicable law, and that the Debtors do not possess and shall not assert any claim,

counterclaim, setoff, or defense of any kind, nature, or description which would in any way

affect the validity, enforceability and non-avoidability of any of the indebtedness, Pre-Petition Claims and Pre-Petition Indebtedness.

V.     The Debtors acknowledge that certain vendors took initial steps to file notices of mineral lien privileges (notices of statutory liens) under Louisiana state law against certain of the Debtors' properties.   The Debtors believe that these vendors did not properly perfect their interests, and therefore they either hold no valid liens or such liens are subordinate to K2 and without value.   Accordingly, the Debtors' believe that these entities are unsecured creditors except to the extent they benefit from the lien of the Creditors' Agent under the DRA. Notwithstanding, as adequate protection to any other secured creditor of the estates that may exist (including any secured creditor asserting mechanics', materialmen's, mineral or other statutory liens) for any diminution in value that may result from the Debtors' use of its respective Cash Collateral (and only to the extent such secured creditor holds a valid and perfected, non-avoidable lien and security interest in Cash Collateral as of the Petition Date (which the Debtors' deny), such secured creditor is granted (effective upon the Petition Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or otherwise), a replacement security interest and lien in the applicable Debtor's post-petition assets that are subject to its existing, prepetition liens and security interests with the same description, scope, validity, and priority as such prepetition liens and security interest held by such secured creditor on the Petition Date.   The Debtors reserve all rights to contest the validity, amount and priority of any and all claims, liens and security interests asserted by such secured creditors.[3]

*Pre-Petition Collateral*

---

[3] Further, K2 reserves all rights to contest the validity, amount and priority of any and all claims, liens and security interests asserted by creditors.

W.    The Debtors stipulate, except with respect to the ST 198 Lease, that the Pre-Petition Claims evidenced by the Pre-Petition Loan Documents are secured by perfected first priority liens and security interests in all property described in the Pre-Petition Loan Documents including, *inter alia*, all working capital and personal property assets of the Debtors (as more fully described in the Pre-Petition Loan Documents) including, without limitation, a pledge of all issued and outstanding equity of the Debtors, accounts, chattel paper, copyrights, patents, trademarks, documents, equipment, software, programs, peripherals, and other similar items related thereto, general intangibles, goods, fixtures, instruments, inventory, investment property, refunds, cash and cash equivalents, letters of credit, letter-of-credit rights and supporting obligations, deposit accounts, commercial tort claims; and accessions to, substitutions for, and replacements, proceeds (including stock rights), insurance proceeds, and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any general intangibles at any time evidencing or relating to any of the foregoing (collectively, the "Pre-Petition Collateral"). K2's liens and security interests in the Pre-Petition Collateral were granted pursuant to, *inter alia*, the Pre-Petition Loan Documents.

X.    The Debtors stipulate that K2 holds properly perfected first priority liens and security interests and other liens in the Pre-Petition Collateral (except with respect to the ST 198 Lease), the Post-Petition Collateral (defined below), as evidenced by, among other things, the Pre-Petition Loan Documents, this Order, and documents held in K2's possession and documents filed with the appropriate state, county, and other offices.

*Pre-Petition Default*

Y.    The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations to K2 under the terms and provisions of the Pre-Petition Loan Documents.

The Debtors stipulate that these defaults exist, have not been timely cured, and are continuing. The Debtors stipulate that the Pre-Petition Claims were accelerated prior to the filing of this Case. The Debtors further stipulate that the filing of this Case has accelerated the Pre-Petition Claims for all purposes in this Case and in connection with K2's enforcement of its rights and remedies under non-bankruptcy law. Additionally, the Debtors stipulate that the Pre-Petition Claims remain due and owing to K2 without any claim, counterclaim, setoff, or defense of any kind, nature, or description.

### Cash Collateral

Z.      For purposes of this Order, "Cash Collateral" shall mean all cash, cash equivalents, negotiable instruments, refunds, documents of title, securities, deposit accounts, or other cash equivalents existing as of the Petition Date or generated thereafter.[4] Cash Collateral shall also consist of all of the Debtors' property that constitutes Cash Collateral in which K2 has an interest as provided in Section 363(a) of the Bankruptcy Code and shall include, without limitation:

(a)      All cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any property upon which K2 holds a lien or a replacement lien, whether as part of the Pre-Petition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property that has been converted to cash, existed as of the Petition Date, or arose or was generated thereafter; and

(b)      All of the respective deposits, refund claims and rights in retainers of the Debtors upon which K2 holds a lien or replacement lien, whether as part of the Pre-Petition Collateral or pursuant to an order of the Court or applicable law or otherwise. The Debtors' cash on hand as of the Petition Date and cash flow from operations are proceeds of Pre-Petition Collateral, and all such cash is Cash Collateral.

AA.     The Debtors stipulate that K2 has first priority perfected liens and security interests in Cash Collateral pursuant to the Pre-Petition Loan Documents, Sections 363(a) and

---

[4] Cash Collateral expressly does not include cash that K2 obtained and applied to Probe's indebtedness prior to the Petition Date.

552(b) of the Bankruptcy Code, and this Order.  Jeffrey A. Compton in his capacity as the Creditors' Agent under the DRA, the First Amended DRA, and the Second Amended DRA has second priority security interests in certain Cash Collateral, and first priority perfected security interest any proceeds resulting from the ST 198 Lease.  The ST 198 Lease, however, is undeveloped and not producing, and the value of the Creditors' Agent's subordinate interest in Cash Collateral is zero.  Likewise, the Debtors do not have any holders of valid or properly perfected statutory liens that would result in an interest in Cash Collateral.  Accordingly, K2 is the only creditor with an interest in Cash Collateral.

BB.    K2 does not consent to the Debtors' use of Cash Collateral except in strict compliance with the terms and conditions in this Interim Order, and the four-week budget (the "Budget") attached as **Exhibit A**.  Without the use of Cash Collateral, the Debtors will not have the funds necessary to maintain their assets, sell, or otherwise liquidate their assets, provide financial information, pay necessary employees, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' assets.   The Debtors require the use of Cash Collateral as provided herein. Allowing the Debtors to use under the terms of this Order is in the best interest of these Chapter 11 estates (collectively, the "Estates").

### Binding Agreement

CC.    The agreements and arrangements authorized under this Order have been negotiated at arm's length, are fair and equitable under the circumstances, and are enforceable pursuant to their terms.  The Debtors and K2 have acted in good faith (including, without limitation, as that term is used in Section 363 of the Bankruptcy Code and otherwise) in the negotiation and preparation of this Interim Order, have been represented by counsel, and intend to be and are bound by the terms of this Order.

### Notice of Interim Hearing

DD.    The Debtors' counsel has certified that a copy of the Motion and notice of the interim hearing on the Motion have been served either by the Court's electronic filing system ("ECF"), electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the Office of the United States Trustee (the "U.S. Trustee"), K2, and all creditors known to have any liens against the Debtors' assets.    Notice of the Motion and the interim hearing were given to prevent immediate and irreparable harm pursuant to Rules 2002, 4001, 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules, and as required by Sections 102, 105, 361, 362, and 363.

*Good Cause*

EE.    Good cause has been shown for the entry of this Interim Order and authorization for the Debtors' use of Cash Collateral pending a final hearing pursuant to Bankruptcy Rule 4001.

FF.    The Debtors' need for use of Cash Collateral is immediate and critical.    Entry of this Interim Order will enable the Debtors to preserve the assets of these Estates, will increase the possibility of a successful reorganization and is in the best interests of the creditors of the Estates.    The terms of the use of Cash Collateral authorized hereby appear fair and reasonable, reflect the Debtors' exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

**NOW THEREFORE**, on the Debtors' Motion and the record before this Court with respect to the Motion made, and good cause appearing, the Court finds that certain of the relief requested in the Motion is necessary, essential, and appropriate for the continued operation of their business.    Accordingly, any objections to the Motion that relate to the entry of this Interim

Order are **OVERRULED,** the Motion is **GRANTED** as provided herein, and it is hereby **ORDERED:**

### Approval of Use of Cash Collateral

1.      The Debtors are authorized to use Cash Collateral in strict compliance with the terms and conditions contained in the Budget and this Interim Order (as the same may be revised, modified and/or extended from time to time as provided herein).

2.      Notwithstanding the DRA, all purchasers of oil and gas production from the Debtors' oil and gas properties are directed to deliver any amounts owed to the Debtors pursuant to normal contract terms.  The Creditors' Agent is ordered to deliver to the Debtors any and all proceeds of the Debtors' production received by him on or after November 16, 2010, from production purchasers.

3.      All Cash Collateral shall be deposited into one or more debtor-in-possession Cash Collateral accounts (the "Cash Collateral Accounts") to be maintained at Amegy Bank, provided, however, such accounts shall be established, maintained and shall be subject to the rules and regulations of the U.S. Trustee.  All Cash Collateral Accounts shall contain only Cash Collateral and shall not be commingled with any other funds.  The Cash Collateral Account shall be subject to control agreements in favor of K2.  The Debtors shall maintain adequate books and records so as to be able to track the sources and uses of all Cash Collateral.  The Debtors shall account to K2 for all Cash Collateral that it now possesses, that it permitted to be transferred into the possession of others (if any), that is being held by those in privity with the Debtor, or that the Debtor might hereafter obtain or have any interest in.  The Debtors shall account to K2 for the receipt and use, if any, of the Cash Collateral received by the Debtor since the Petition Date and prior to the entry of this Order.

4.      The Debtors shall be prohibited from withdrawing funds from the Cash Collateral Accounts except in strict compliance with the Budget and the terms of this Order.

5.      K2 shall have no obligation or responsibility to monitor the Debtors' use of Cash Collateral and may rely on the Debtors' representations that the Cash Collateral is being used in accordance with the terms of the this Interim Order and the Budget.

6.      The Debtors are hereby authorized and directed to do and perform all acts and to make, execute, and deliver all instruments and documents, which K2 may reasonably request to evidence the Debtors' obligations under this Order.

*Authorization for Use of Cash Collateral
and Adequate Protection*

7.      As long as no Termination Event (defined below) has occurred, the Debtors are authorized to use Cash Collateral in strict compliance with the Budget, subject to a permitted variance for aggregate cash receipts, disbursements and expenses, each not to exceed fifteen percent (15%) on an aggregate basis or a line item-by-line-item basis measured weekly on a rolling four-week basis beginning from the Petition Date.[5]   K2's consent to use of Cash Collateral, is limited to the terms provided under this Order and the Budget.   Upon the occurrence of a Termination Event (defined below) and upon delivery of a Termination Notice (defined below), K2's consent to use of Cash Collateral shall be immediately terminated and deemed withdrawn, except that the Debtors may continue to use any Cash Collateral in their

---

[5] Provided that the Debtors (i) are not otherwise in default, (ii) have not deviated from the Budget, either on a cumulative basis or with regard to any specific budgeted line item in any given rolling four-week period, and (iii) the Debtors' actual expenditures for any specific budgeted line item are less than the budgeted disbursements for such specific line item, then the budgeted disbursement for such line item for the following month shall be deemed automatically increased in an amount equal to the amount by which the budgeted disbursement exceeded the actual expenditure. The "Contingency Event" line item referenced in the Budget may be utilized on a one-time basis by the Debtors, with the K2's written consent, for non-recurring expenses arising from unforeseen operational emergencies. In order to draw the Contingency Event amount, the Debtors must provide notice to K2 and obtain the prior written consent of K2. Unless a Termination Event has occurred, K2's consent for requested "Contingency Event" expenditures may not be unreasonably withheld. The Contingency Event shall not be included in the calculation of the permitted variance under the Budget.

actual possession on the date of the Termination Notice (defined below), to pay budgeted expenses that were actually incurred in accordance with the Budget, before such Termination Notice (defined below), but which remain unpaid on the date of the Notice.

8.     The Budget may be revised, modified and/or extended for additional periods in writing with K2's prior written consent and without further court approval, and any such revised, modified and/or extended version shall constitute the Budget hereunder.

9.     K2 is entitled pursuant to Section 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral on account of the Debtors' use of the Cash Collateral to the extent it results in a decrease in value of such interests (the "Diminution in Value"). As adequate protection to K2 for the aggregate Diminution in Value, K2 shall be and hereby is granted (effective upon the Petition Date and without the necessity of the execution or filing by the Debtors or K2 of mortgages, security agreements, pledge agreements, financing statements, or otherwise), the following (the "Adequate Protection Obligations"), subject to, in each case, the Carve Out (defined below):

>     a.     Adequate Protection Liens. To the extent of Diminution in Value, to the same extent and in the same priority as may be validly held by K2 as of the Petition Date, K2 shall have and is hereby granted (effective as of the Petition Date), valid and automatically perfected replacement security interests and liens (the "Replacement Liens") in and upon all of the property and assets that are included within the definition of their Prepetition Collateral, including the real and personal property of Debtors owned as of the Petition Date or created or acquired at any time after the Petition Date, including, without limitation, all assets of any of the Debtors of any kind or nature whatsoever, whether real or personal, tangible or intangible, wherever located, including, without limitation, all accounts (including inter-company accounts receivable), cash (including the Cash Collateral), chattel paper, refunds, insurance proceeds, contract rights, deposit accounts, documents, general intangibles, fixtures, goods, instruments, inventory, investment property, leases, letters of credit, letter-of-credit rights, machinery and equipment, payment intangibles, real property, supporting obligations, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (provided, that, such causes of action shall not include any claims, causes of action and recoveries realized pursuant to sections

544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, except those attributable to claims, if any, against K2), and all proceeds products and offspring of any of the foregoing (the "Post-Petition Collateral");

   b. Superpriority Claims.  To the extent of Diminution in Value, K2 shall have an allowed superpriority administrative expense claim in the amount of such insufficiency as provided in and to the full extent allowed by Sections 503(b) and 507(b) of the Bankruptcy Code (the "Superpriority Claims"); provided, however, the Superpriority Claims shall not attach to proceeds or recoveries from any claims, causes of action and recoveries realized pursuant to sections 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code.  The Superpriority Claims shall be allowed claims against each Debtor (jointly and severally).

   c. Right to Credit Bid.  K2 shall have the right to credit bid the Pre-Petition Indebtedness in the amount of K2's allowed secured claim at the time of any such bid in connection with any sale or exchange of the Pre-Petition Collateral or Post-Petition Collateral, regardless of whether such sale or exchange takes place inside or outside of a plan of reorganization, which right shall be in addition to and shall supplement their right to credit bid as it may exist under the Pre-Petition Loan Documents and applicable law.

  10. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Adequate Protection Obligations upon the Pre-Petition Collateral and the Post-Petition Collateral without the necessity of filing or recording any deed of trust, financing statement or other instrument or document that may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Adequate Protection Obligations or to entitle K2 to the priorities granted herein.  Notwithstanding the Debtors may execute, if required, and K2 may file or record a deed of trust, financing statement or other instruments or provide notice to evidence and to perfect the Adequate Protection Obligations authorized hereby, provided further that no such filing or recordation or notification shall be necessary or required to create or perfect any such right or lien.

11.     K2 may file a copy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which a Debtor has real or personal property.

12.     This Interim Order shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors in accordance with their terms.

13.     Subject to the Carve-Out, no costs or expenses of administration incurred in this Case are, or will be, prior to or on a parity with the Adequate Protection Obligations, obligations arising under the Pre-Petition Loan Documents, or with any other claims of K2 under this Order.

14.     Unless K2 has provided its prior written consent, no order shall be entered in this Case, or in any successor case, that authorizes the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Pre-Petition Collateral or the Post-Petition Collateral that is equal or senior to the liens and security interests held by K2.

15.     All Adequate Protection Obligations and other protections afforded to K2 under this Interim Order and any actions taken pursuant thereto shall survive any order that may hereafter be entered, and the Adequate Protection Obligations provided herein shall continue to be valid and enforceable in this Case and in any such successor case, and such protections shall maintain their priority as provided by this Interim Order, except as expressly provided herein.

### Termination Events

16.     The following shall constitute termination events under this Interim Order (each a, "Termination Event"):

a. the earlier of (i) the date of a final hearing on the Motion, or (ii) 5:00 p.m. (prevailing Central time) on December 14, 2010, or such later date as may agreed upon in writing by the Debtors and K2;

b. any default, violation, or breach of any of the terms of this Order, by any of the Debtors, including any of the Debtors' failure to use the Cash Collateral in strict compliance with this Order and the Budget;

c. an order entered by the Court confirming a plan of reorganization in the Case, which does not contain a provision for the continuation of the protections granted to K2 hereunder and the priorities thereof until such plan effective date;

d. an order with respect to the Case entered by the Court without the express prior written consent of K2, (i) to revoke, reverse, stay, modify, supplement or amend the Interim Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Debtor equal or superior to the priority of K2, except for the Carve-Out, or (iii) to grant or permit the grant of a lien on the Pre-Petition Collateral or Post-Petition Collateral senior or equal to the liens of K2;

e. an order entered by the Court authorizing the rejection or assumption of any oil and gas lease, operating agreement, oil and gas sale, gathering, processing, treating or transportation contract (that was not consented to by K2) under Section 365(a) of the Bankruptcy Code;

f. an order entered by any court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Debtor with respect to a claim or property having a value of at least $100,000;

g. (i) the attempt by any Debtor to invalidate, reduce or otherwise impair liens of the K2, the claims or rights of K2 or to subject any Pre-Petition Collateral or Post-Petition Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien created by any order of the Court that finding, for any reason, that the Interim Order fails or ceases to create a right of the requisite priority on any collateral purported to be covered by the Adequate Protection Obligations, or (iii) any action commenced by any Debtor, which contests the validity, perfection or enforceability of any of the lien of K2 or any right created in favor of K2 under any order of the Court;

h. the filing of any pleading or motion by a Debtor which attempts to utilize the Cash Collateral of K2, without its consent;

i. the determination of any Debtor, without the consent of the K2, to suspend the operation of its business in the ordinary course, liquidate all or substantially all of its assets, or employ an agent or other third party to conduct any sales of all or substantially all of its assets, or the filing of a motion or other application

by a Debtor seeking authority to do any of the foregoing, or the filing of a motion or other application by a person other than a Debtor, seeking authority to do any of the foregoing, and such motion or application is not contested by Debtors in good faith or the relief requested by such person is granted in an order that is not stayed pending appeal;

j.   any provision of this Interim Order at any time or for any reason (other than pursuant to the express terms hereof) ceases to be valid and binding on or enforceable against any Debtor, or a proceeding commenced by any Debtor or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Debtor denying in writing that it has any liability or obligation purported to be created under this Interim Order or under the Pre-Petition Loan Documents.

k.   the Debtors' failure to file a Disclosure Statement and Plan of Reorganization reasonably acceptable to K2 within sixty days of the Petition Date;

l.   the Debtors' failure to have the exclusive right to file and obtain acceptances of a plan in the Case, unless such exclusive right is contested by K2;

m.   the reversal, vacation or stay of the effectiveness of the Interim Order; and

n.   the failure of the Adequate Protection Obligations to be valid, perfected and enforceable in all respects or any other  protection under this Order.

**Remedies Upon the Occurrence of a Termination Event**

17.    After the occurrence of a Termination Event and written notice of the occurrence of a Termination Event provided by K2 to any Debtor (the "Termination Notice"), the Debtors shall have no right to use Cash Collateral, except that the Debtors may continue to use Cash Collateral in its actual possession as of the date of the Termination Notice, to pay budgeted expenses that were actually incurred in accordance with the Budget, before delivery of a Termination Notice, but which remain unpaid on the date of the Notice.[6]    Termination of the Debtors' right to use Cash Collateral pursuant to the provisions of this paragraph shall in no manner affect the validity, enforceability, or priority of the Adequate Protection Obligations,

---

[6] K2 reserves all rights to disgorge any amounts improperly paid by the Debtors after the delivery of a Termination Notice.

including the replacement liens and superpriority claims, or the other protections granted under the provisions of this Interim Order.

*Carve-Out*

18.     As used in this Interim Order, "Carve-Out" shall mean (a) the statutory fees payable to the U.S. Trustee pursuant to 11 U.S.C. §326; and (b) accrued, but unpaid professional fees of the Debtors and the Committee, to the extent ultimately allowed by the Court, limited to (i) the amounts set forth in the Budget (including separate line items for the Debtors' professionals and any Committee's professionals) and (ii) amounts that have been incurred before the delivery to any Debtor and their counsel of a valid Termination Notice; and (c) after delivery to any Debtor and their counsel of a valid Termination Notice, the payment of professional fees and disbursements (regardless of whether approved and unpaid or pending approval by the Bankruptcy Court) incurred by the Debtors or the Committee, after the delivery of a valid Termination Notice, in an amount not to exceed $50,000.00 in the aggregate for all professionals who are required to file fee applications with the Court (the "Retained Professionals").

19.     The Carve-Out shall not include, and Cash Collateral may not be used for, the payment or reimbursement of any fees or disbursements of the Debtors, any party-in-interest, the Committee, any additional committees appointed in this case (if any), or any trustee appointed in this Case incurred in connection with the assertion and prosecution of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (x) commencing or prosecuting any action asserting claims pursuant to sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or other cause of action (whether

arising under state law, the Bankruptcy Code or other federal law) against K2 with respect to the validity and extent of the obligations hereunder or the obligations under the Pre-Petition Loan Documents, or the validity, extent and priority of the Pre-Petition Claims, liens, or security interests securing the obligations hereunder or the obligations under the Pre-Petition Loan Documents; (y) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Pre-Petition Claims, K2's liens on and security interests in the Post-Petition Collateral or the Pre-Petition Collateral; (z) preventing, hindering or delaying (whether, directly or indirectly) K2 in respect of its liens and security interests in the Post-Petition Collateral or Pre-Petition Collateral. Under no circumstances may Cash Collateral be used to pay professional fees and expenses incurred by the Debtors or any committee to investigate the extent, validity and priority of claims and liens of K2 relating to the Pre-Petition Claims or the Pre-Petition Indebtedness, or to challenge any liens or claims relating to the Pre-Petition Claims or Pre-Petition Indebtedness.

20.    The Carve-Out shall not include any fees or expenses of a Chapter 7 trustee or any fees or disbursements arising after the conversion of any of these Chapter 11 cases to a Chapter 7 case.

21.    The dollar amounts available to be paid under the Carve-Out shall be reduced, on a dollar-for-dollar basis, to the extent proceeds of any Pre-Petition Collateral or Post-Petition Collateral are used to pay fees or expenses of any professionals incurred after the delivery of a Termination Notice.  K2 shall retain any and all rights as a party-in-interest to object to any claims of any professionals.

22.    Nothing contained in this Interim Order shall be construed:  (a) to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Bankruptcy Court-approved procedure from the applicable provisions of

bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and if applicable, any subsequent order of this Court requiring that such payments be disgorged, and/or (b) as consent to the allowance of any fees and expenses referred to above, and shall not affect any right of parties-in-interest to object to the reasonableness of such amounts.

23.    No payments approved by the Court and made to professionals for fees and expenses pursuant to and in accordance with the Budget and the Carve Out shall be subject to disgorgement solely on account of any liens of K2 or super-priority or other claims granted to K2 under this Order. No payments for budgeted expenses actually incurred pursuant to and in accordance with the Budget and this Order, and prior to the delivery of a Termination Notice, shall be subject to disgorgement solely on account of any liens of K2 or super-priority or other claims granted to K2 under this Order.

*Reporting Requirements*

24.    By the close of business on Wednesday of each week during the pendency of the Case, the Debtors shall provide to K2 a written cash-flow accounting for all cash collected during the preceding week, accounts receivable aging report, and all expenditures from the Petition Date to the date of reporting of Cash Collateral.[7]    If requested, the Debtors shall immediately make available to K2 (or any of their agents and professionals) supporting documentation for all receipts and expenditures, including, but not limited to, bank statements, contracts, invoices, copies of checks and general ledgers.

25.    Reporting requirements shall also include, but only with respect to any attempts to market or sell any of the Pre-Petition Collateral or the Post-Petition Collateral, (a) weekly status calls with K2 and its advisors and counsel to discuss the status of the case and reorganization

---

[7] The Debtors shall provide a comparison of actual versus budgeted expenditures on a weekly basis.

efforts and/or any marketing process; (b) weekly written update of all parties contacted and status of any marketing efforts; (c) copies of indication of interest, letter of intent or other similar documents received as a result of any marketing process for any of the collateral; (d) copies of any purchase and sale agreements (including interim drafts) relating to the sale of any of the collateral.  If requested, the Debtors shall immediately make available to K2 (or any of its agents and professionals) supporting documentation for all receipts and expenditures, including, but not limited to, bank statements, contracts, invoices, copies of checks and general ledgers.

*Challenge Rights*

26.     Any motion or complaint by any party-in-interest, seeking to challenge the extent, validity, or priority of K2's security interests and liens or to assert claims against K2 in this Case shall be filed on or before December 30, 2010 (the "Challenge Period").  Subject to the Challenge Period, the extent, validity, perfection, enforceability, and priority of the Pre-Petition Claims, the Pre-Petition Indebtedness, liens on the Pre-Petition Collateral are for all purposes subject to the rights of any party-in-interest with proper standing, other than the Debtors, to file a complaint pursuant to Bankruptcy Rule 7001, seeking to invalidate, subordinate, or otherwise challenge the Pre-Petition Indebtedness and/or K2's liens upon and security interests in the Pre-Petition Collateral.

27.     Unless such motion or complaint as provided in the preceding paragraph is timely filed by such parties-in-interest with proper standing to assert such motion or complaint, or the Committee within the Challenge Period then (a) K2's security interests in and liens upon the Pre-Petition Collateral shall be recognized and allowable as valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses, and perfected to the extent provided herein, and the Pre-Petition Indebtedness shall be allowed in the full amount specified in paragraph T hereof pursuant to Sections 502 and 506 of the Bankruptcy Code or any other

applicable federal or state law, and (b) the acknowledgements contained in paragraphs T - W and paragraph AA shall be binding on all parties-in-interest.

### **Miscellaneous Provisions**

28.     All of the Adequate Protection Obligations and other protections provided to K2 under this Order shall be binding on the Debtors, any successor trustee for the Estates, and all creditors of the Estates.

29.     Nothing herein shall be deemed to be a waiver by K2 of its rights to request additional or further protection of its interests in any of the Debtors' property, to move for relief from the automatic stay, to seek the dismissal of any of the cases, to exercise its right to credit bid at any sale of the collateral, or to request any other relief in this Case, nor shall anything herein constitute an admission by K2 of the quantity, quality or value of any collateral securing the obligations.  K2 shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) in connection with any use, sale or other disposition of any of the collateral, to the extent that the protection afforded by this Order to K2's interests in any collateral proves to be inadequate.

30.     Until the earlier of (i) the date of a final hearing on the Motion, or (ii) 5:00 p.m. (prevailing Central time) on December 14, 2010, (or as extended under subsequent Court orders), as additional adequate protection, all interest, fees, costs, and expenses, including attorneys' fees and expenses, due at any time under the Pre-Petition Loan Documents, as applicable, or that are incurred as a result of the Debtors' Case (collectively, the "Lender's Costs"), may be charged by K2 and shall be paid by the Debtors out of the Cash Collateral, on a monthly basis, up to the aggregate amount for such Lender's Costs set forth in the Budget or, if greater than such amount in the Budget, as approved in writing by K2.  The Debtors are hereby authorized to pay such Lender's Costs without K2 or its counsel having to file any further application with this Court for

approval or payment of Lender's Costs. Any such Lender's Costs incurred by professionals retained by K2 shall be paid within ten (10) calendar days of delivery of a summary invoice to the Debtors, with a copy to the U.S. Trustee and any official committee appointed in this Case; provided, however, that if the Debtor, U.S. Trustee, or any official committee objects to the reasonableness of such fees and expenses and cannot resolve within five (5) business days of service of such invoice(s), the Debtors, U.S. Trustee, or any official committee, as the case may be, shall file and serve upon such professional an objection with the Court (a "Fee Objection") limited to the issue of the reasonableness of the disputed fees and expenses; provided, further, that the Debtors shall timely pay in accordance with this Order the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed.

31.     K2 shall not (a) have liability to any third party nor shall they be deemed to be in control of the operations of the Debtors or to be acting as a "controlling person", "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar federal or state statute), or owe any fiduciary duty to the Debtors, their creditors or their bankruptcy estates, and (b) K2's relationship with the Debtors shall not constitute nor be deemed to constitute a joint venture or partnership with any of the Debtors.

32.     No costs or expenses of administration which have or may at any time be incurred in this Case (or in any successor Chapter 7 case) shall be charged against K2 or its collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of K2, and no such consent shall be implied from any other action, inaction, or acquiescence by K2.  K2

shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the collateral.

33.     The Debtors shall permit representatives, agents and/or employees of K2 to have reasonable access to the Pre-Petition Collateral, Post-Petition Collateral, the premises, and all information and records related thereto during normal business hours (without unreasonable interference with business or financial affairs) and shall cooperate and consult with, and provide to such persons all such non-privileged information as they may reasonably request.

34.     The Debtors are not authorized to use any Net Production Proceeds (defined below) attributable to the alleged 44% interest of Petrodome Energy, LLC and/or Petrodome EC, LLC (collectively "Petrodome") in the EC 36 Lease, the EC 37 Lease or the Vermillion 20 Lease, absent a further order of the Court.  For purposes of the preceding sentence, "Net Production Proceeds" shall mean gross proceeds attributable to the alleged 44% Petrodome interest, less Petrodome's alleged 44% share of any amounts paid by the Debtor on account of any applicable lease burdens or obligations of the Debtors under any applicable joint operating agreement.

35.     Further, nothing in this Interim Order will prejudice the rights, if any, of Petrodome under 11 U.S.C. § 365(i) or (j), and the liens granted herein shall not diminish any rights of Petrodome as of the Petition Date.

36.     The Debtors are hereby authorized to open one or more Debtor in Possession accounts in the name of Probe Resources U.S. Ltd.  The authorized signatories on the account shall be Coy Gallatin, Suzanne Ambrose and Rick Fitzgerald.

## Notice

37.     Within three (3) days of entry, the Debtors shall serve by U.S. mail and/or by electronic mail a copy of this Order to (i) parties having been given notice of the emergency

interim hearing; (ii) any other party that has filed a request for notice with this Court; (iii) counsel for K2; and (iv) the United States Internal Revenue Service.

### Opportunity to Object

38.     Pursuant to Rule 4001(d)(2), the final hearing to consider the Motion and Final Order shall be held on 12|21, 2010, at 3:00 p.m., at the United States Bankruptcy Court, _____, before the Honorable _____, United States Bankruptcy Judge. No later than _____, 2010, the Debtors shall provide notice of the final hearing on the Motion to the parties specified herein.  The notice of hearing shall state that any party in interest objecting to the DIP Loan Agreement or the terms of the Final Order shall file written objections with the United States Bankruptcy Court Clerk for the _____, _____ Division, no later than 4:00 p.m. (CST) on 12|17, 2010 (the "Objection Deadline"), which objections shall be served on the Debtors' counsel and K2's counsel so that all objections are received by no later than 4:00 p.m. (CST) on the Objection Deadline.

###END OF ORDER###

**AGREED:**

By: /s/ Douglas S. Draper
Douglas S. Draper (LA Bar No. 5073)
William H. Patrick, III (LA Bar No. 10359)
Leslie A. Collins (LA Bar No. 14891)
Heller, Draper, Hayden, Patrick & Horn, LLC
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
Telephone: (504) 299-3300
Fax:      (504) 299-3399
E-mail:  ddraper@hellerdraper.com
E-mail:  wpatrick@hellerdraper.com
E-mail:  lcollins@hellerdraper.com

**PROPOSED COUNSEL FOR DEBTORS AND
DEBTORS-IN-POSSESSION**

By: /s/ Tye C. Hancock
**Rhett G. Campbell**
State Bar No. 03714500
**Tye C. Hancock**
State Bar No. 24032271
**Demetra L. Liggins**
State Bar No. 24026844
THOMPSON & KNIGHT, LLP
Three Allen Center
333 Clay Street
Suite 3300
Houston, Texas  77002
(713) 654-8111 (telephone)
(713) 654-1871 (facsimile

**COUNSEL FOR THE K2 PRINICPAL FUND, L.P.**