## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

IN RE:

PROBE RESOURCES US, LTD.[1]

DEBTORS

CASE NO. 10-40395

CHAPTER 11

*Jointly Administered*

### AMENDED MOTION FOR ORDER AUTHORIZING THE DEBTORS TO: (I) ENTER INTO POST-PETITION FINANCING AND OBTAIN POST-PETITION FINANCING INCLUDING THE EAST CAMERON 246 FACILITY (ADDED BY THIS AMENDMENT); AND EMERGENCY MOTION (II) AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING SECURITY INTEREST AND SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V) MODIFYING AUTOMATIC STAY; AND (VI) SCHEDULING A FINAL HEARING ON THE MOTION

### THE COURT HAS SET JANUARY 13, 2011 AT 2:00 O'CLOCK, ON THE DEBTORS' MOTION. THE AMENDED MOTION WILL BE HEARD ON THAT DATE.

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Probe ST 214, LTD., Probe Resources, US LTD., Probe High Island 115 LTD., Probe Resources Energy Marketing US LTD, and Probe Resources Ltd., debtors and debtors-in-possession (collectively, the "Debtors" or the "Probe"), file this *Motion For Order Authorizing the Debtors to: (i) Enter into Post-Petition Financing and Obtain Post-Petition Financing; and Emergency Motion (ii) Authorizing Use of Cash Collateral; (iii) Granting Security Interest and Superpriority Claims; (iv) Granting Adequate Protection; (v) Modifying Automatic Stay; and (iv) Scheduling a Final Hearing on the Motion* (the "Motion").  In support of the Motion, the Debtors incorporate *the Declaration of T. Coy Gallatin in Support of Voluntary Petitions, First Day Motions, and Designation as Complex Bankruptcy Case* (the "Gallatin Declaration"), previously filed.

---

[1] Probe ST 214 Ltd., Probe High Island 115 Ltd., Probe Resources Energy Marketing US Ltd. and Probe Resources Ltd. are jointly administered with Probe Resources US Ltd.

{00311872-1}

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue of this case is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicate for relief requested in this Motion is 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## FACTUAL AND PROCEDURAL BACKGROUND

4.      On November 16, 2010 (the "Petition Date"), the Debtors commenced these cases (the "Case") by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors have sought the joint administration of their cases.

5.      Since the Petition Date, the Debtors have continued to operate and manage their business as debtors-in-possession pursuant to §§ 1107 and 1108(a) of the Bankruptcy Code.

6.      To date, the Office of the United States Trustee (the "U.S. Trustee" has not appointed an official committee of unsecured creditors (a "Committee").

*Pre-Petition Debt*

**Original K2 Debt**

7.      On February 19, 2009, The K2 Principal Fund L.P. ("K2" or the "DIP Lender") and PROBE RESOURCES LTD. ("Probe Parent"),[2] entered into a term credit facility agreement in the principal amount of $8,500,000 (the "Original Credit Agreement").  The current amount outstanding as of the Petition Date under the Original Credit Agreement is approximately $4,652,757 plus fees, interest and attorney's fees accruing pursuant to the terms of the Original

---

[2] Probe Parent is a British Columbia corporation and the owner of all the equity in the other Debtors herein.

Credit Agreement (the "Original K2 Debt").  K2 is secured by liens on all or substantially all of Probe Parent property, which consists primarily of equity interests in the Debtors.

8.      PROBE ST 214 LTD. ("Probe 214"), a Nevada corporation, owns interests in various offshore oil and gas properties in the Gulf of Mexico including those generally known as: OCS-G 24979, Block 214 South Timbalier Area (the "ST 214 Lease"); OCS-G 24791, Block 36 East Cameron Area (the "EC 36 Lease"); and OCS-G 24805, Block 246 East Cameron Area (the "EC 246 Lease").  Probe 214 is the beneficiary of the loan proceeds disbursed pursuant to the Original Credit Agreement.

9.      Probe 214 guaranteed payment of the Original K2 Debt through a written guarantee (the "Probe 214 Guarantee") dated February 19, 2009 and granted a lien to K2 to secure payment of the Original K2 Debt through (a) a Security Agreement dated February 19, 2009 and registered under the Uniform Commercial Code (Nevada) on February 20, 2009 in favor of K2 on all of the assets and undertakings of Probe 214, (b) a Mortgage dated February 19, 2009 and recorded on February 23, 2009 in Terrebonne Parish, Lafourche Parish, and Cameron Parish, Louisiana, and (c) deposit account control agreements covering all deposit accounts (collectively and together with the Original Credit Agreement, the Probe 214 Guarantee and all related loan documents, the "Original Credit Loan Documents").  The Original K2 Debt is secured by all assets of Probe 214.

**K2-TEC Debt**

10.     On January 20, 2009, Third Eye Capital Corporation ("TEC")[3] and Probe Parent entered into that certain Note and Warrant Purchase Agreement (the "Note Purchase Agreement") for the issuance of senior secured notes in the aggregate principal amount of $10,000,000 and certain warrants for common shares in Probe Parent.  The current amount

---

[3] There is no affiliation between TEC and K2.

outstanding under the Note Purchase Agreement as of the Petition Date is approximately $8,419,948 plus fees, interest and attorney's fees accruing pursuant to the terms of the Note Purchase Agreement and related loan documentation (the "K2-TEC Debt"). The K2-TEC Debt is secured by liens on all or substantially all of Probe's property, pursuant to (a) a Security Agreement dated January 20, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (British Columbia) on January 19, 2009 in favor of TEC and (b) a Blocked Account Agreement dated February 3, 2009 (collectively and together with the Note Purchase Agreement and all related loan documents, the "K2-TEC Loan Documents").

### Probe 115 Guarantee

11.     PROBE HIGH ISLAND 115 LTD. ("Probe 115"), a Nevada corporation, owns an interest in an offshore oil and gas property generally known as: OCS-G 18936, Block 115 High Island Area (the "HI 115 Lease"). Probe 115 guaranteed payment of the K2-TEC Debt through a Secured Continuing Unconditional Guaranty (the "Probe 115 Guarantee") dated January 20, 2009 and granted a lien to TEC to secure payment of the K2-TEC Debt through (a) a Security Agreement dated January 22, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (Nevada) on January 21, 2009 in favor of TEC, (b) a Mortgage, Deed of Trust, Security Agreement, Financing Statement and Assignment of Production dated January 20, 2009 and recorded in Jefferson County, Texas, covering the HI 115 Lease, and (c) a Deposit Account Control Agreement. The K2-TEC Debt is secured by all assets of Probe 115 (collectively and together with the Probe 115 Guarantee and all related documents, the "Probe 115 Guarantee Documents").

**Probe US Guarantee**

12.     PROBE RESOURCES US LTD. ("Probe US"), a Nevada corporation, is the operator of properties owned by Probe 214 and owns interests in various offshore oil and gas properties in the Gulf of Mexico including those generally known as:  OCS-G 32214, Block 198 South Timbalier Area (the "ST 198 Lease"); OCS-G 25933, 37 Block East Cameron Area (the "EC 37 Lease"); and OCS-G 31329 Block 20 Vermilion Area (the "Vermilion 20 Lease").

13.     Probe US guaranteed payment of the K2-TEC Debt through a Secured Continuing Unconditional Guaranty (the "Probe US Guarantee") dated January 22, 2009 and granted a lien to TEC to secure payment of the K2-TEC Debt through (a) a Security Agreement dated January 22, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (Nevada) on January 21, 2009 in favor of TEC, (b) an Act of Mortgage and Security Agreement Securing Future Obligations dated January 21, 2009 and recorded in Vermilion Parish, Terrebonne Parish, Lafourche Parish, and Cameron Parish, Louisiana, covering the EC 37 Lease and the Vermilion 20 Lease, among other mortgaged property and (c) a Deposit Account Control Agreement.  The K2-TEC Debt is secured by all assets of Probe US except for the ST 198 Lease (collectively and together with the Probe US Guarantee and all related documents, the "Probe US Guarantee Documents").

**Probe 214 TEC Guarantee**

14.     Probe 214 guaranteed payment of the K2-TEC Debt through a Secured Continuing Unconditional Guaranty (the "Probe 214 TEC Guarantee") dated February 19, 2009 and granted a lien to TEC to secure payment of the TEC Debt through (a) a Security Agreement dated February 19, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (Nevada) on February 23, 2009 in favor of TEC, (b) an Act of Mortgage and

Security Agreement Securing Future Obligations dated February 19, 2009 and recorded in Vermilion Parish, Terrebonne Parish, Lafourche Parish, and Cameron Parish, Louisiana, covering the ST 214 Lease, the EC 36 Lease and the EC 246 Lease.  The K2-TEC Debt is secured by all assets of Probe 214; provided however, all liens in favor of TEC are subject to that certain Intercreditor Agreement (the "Intercreditor Agreement") dated February 19, 2009, among TEC, Probe Parent and K2, which subordinates the TEC liens to certain liens of K2 (collectively and together with the Probe 214 TEC Guarantee and all related documents, the "Probe 214 TEC Guarantee Documents").

### Probe Energy Guarantee

15.    Probe Resources Energy Marketing US Ltd. ("Probe Energy") guaranteed payment of the K2-TEC Debt through a Secured Continuing Unconditional Guaranty (the "Probe Energy Guarantee") dated January 22, 2009 and granted a lien to TEC to secure payment of the K2-TEC Debt through a Security Agreement dated January 22, 2009 and registered by an "all assets" financing statement under the Uniform Commercial Code (Nevada) on January 21, 2009 (collectively, and together with the Probe Energy Guarantee and all related documents, the "Probe Energy Guarantee Documents").  The K2-TEC Debt is secured by all assets of Probe Energy.

### Assignment of K2-TEC Debt to K2

16.    By Assignment Agreement dated August 10, 2009 (the "K2-TEC Debt Assignment"), TEC assigned the K2-TEC Debt to K2, together with all liens securing the same. In connection with the K2-TEC Debt Assignment, TEC recorded an Assignment of Notes and Liens dated August 10, 2010 and a Correction Assignment of Notes and Liens in each applicable county and parish (collectively, and together with the K2-TEC Debt Assignment and related

documents, the "K2-TEC Debt Assignment Documents").  Accordingly, K2 is the current owner and holder of the K2-TEC Debt.

**The DRA**

17.     Pursuant to that certain Debt Restructuring Agreement (the "DRA") effective August 31, 2009, Jeffery A. Compton (the "Creditors' Agent") in his capacity as creditors' agent holds a senior security interest in the ST 198 Lease.  The ST 198 Lease, however, is not currently producing. The DRA was the product of numerous meetings and negotiations between the Debtors and their creditors.  The DRA created a litigation moratorium (except for actions required to perfect liens under state law) and allowed the Debtors an opportunity to pay their creditors and continue to operate in the ordinary course of business subject to the terms of the DRA.  In connection with the DRA:  (a)  all creditors reserved any rights under applicable state law; (b) the Debtors agreed to cause all production revenues (excluding production from the HI 115 Lease) to be deposited by the production purchasers into blocked accounts for the benefit of creditors; (c) the Creditors' Agent was appointed to disburse monthly production revenue in accordance with a structure negotiated under the DRA and monitor compliance with a pre-established general and administrative expense budget; (d) the Creditors' Agent reported to a restructure committee of creditors (the "Restructure Committee") appointed under the DRA; and (e) a lien (subordinate to any and all existing liens) was granted to the creditors' agent, for the benefit of the creditors to the DRA (the "Joining Creditors"), to secure performance under the DRA.   All creditors reserved all rights vis-à-vis each other under applicable state law. Distributions commenced under the DRA on or about September 4, 2009.

**The First Amended DRA and the 36/37 Financing**

18.     Effective November 10, 2009, Probe US, Probe 214, the Joining Creditors, the Restructure Committee, and the Creditors' Agent, entered into the First Amendment to Debt Restructuring Agreement (the "First Amended DRA"), which facilitated the provision of financing in the principal amount of $9.25 million (the "36/37 Financing") to the Debtors to complete the development of the EC 36 A-1 well and the EC 37 A-2 well.  The First Amended DRA, inter alia, created a framework to support the 36/37 Financing and a mechanism to repay the associated debt from production proceeds.   Under the 36/37 Financing and security documents (the "36/37 Loan Documents"), K2 was granted liens on all of Probe US and Probe 214's assets.  The lien previously granted to the Creditors' Agent on the EC 36 Lease and the EC 37 Lease was subordinated to K2's liens and rights in those properties.  The 36/37 Financing closed on or about November 12, 2009.

19.     The Debtors' completion operations relating to the 36/37 Financing were largely unsuccessful and did not produce the results that management projected.  Among other things, a mechanical issue arose in connection with the EC 37 A-2 well completion which caused excessive water production.  The current amount owed on account of the 36/37 Financing as of the Petition Date is approximately $10,965,178.

**The 246 Financing and the Second Amended DRA**

20.     The primary term of the EC 246 Lease has expired and the lease is currently held by a "Suspension of Production" and a related development plan approved by the Bureau of Ocean Energy Management, Regulation and Enforcement (formerly the Minerals Management Service) (the "BOEM" or "Bureau").  In order to maintain the lease, Probe is required to achieve certain milestones.  Effective May 19, 2010, Probe US, Probe 214, the Joining Creditors, the Restructure Committee, and the Creditors' Agent, entered into the Second Amendment to Debt

Restructuring Agreement (the "Second Amended DRA"), which was intended to facilitate the provision of financing (the "246 Financing") by K2 to the Debtors in the aggregate amount of approximately $11.1 million for the completion of the EC 246 #2 well. The 246 Financing loan and security documents (the "246 Loan Documents") granted liens to K2 on the EC 246 Lease and subordinated the liens of the Creditors' Agent with respect to the EC 246 Lease. On May 27, 2010, K2 funded the first tranche (Tranche A in the net amount of $1,575,000) of the EC 246 Financing, which the Debtors represented was necessary in order to meet a bonding deadline imposed under the Bureau's development plan. The Debtors subsequently received an extension of deadlines related to the Suspension of Production, but they were required to continue completion operations on the EC 246#2 by December 31, 2010 or the EC 246 Lease may be lost. K2 did not fund the second tranche (Tranche B) of the EC 246 Financing due to failed conditions precedent under the loan documents and the Debtors' failure to present an acceptable out-of-court reorganization plan to restructure the companies' obligations. The current amount outstanding under the 246 Financing as of the Petition Date is approximately $1,899,301.

21.    Probe US and Probe 214 defaulted under the Second Amended DRA on September 15, 2010, by failing to repay the debts due and owing to the Joining Creditors. The Creditors' Agent sent a notice of default to Probe US and Probe 214, and the moratorium under the DRA, as amended, terminated.

*Pre-Petition Loan Documents*

22.    Pursuant to the Original Credit Loan Documents, the K2-TEC Loan Documents, the Probe US Guarantee Documents, the Probe 214 Guarantee Documents, the Probe 115 Guarantee Documents, the Probe Energy Guarantee Documents, and the K2-TEC Debt Assignment Documents, the 36/37 Loan Documents and the 246 Loan Documents (collectively,

the "Pre-Petition Loan Documents"), K2 holds a senior secured first priority position in all of the Debtors' assets save the ST 198 Lease. K2 holds a subordinate lien on the ST 198 Lease to secure the amounts owed in connection with the 36/37 Financing. The Debtors retain true and correct copies of the Pre-Petition Loan Documents and will provide copies to interested parties upon request. The Debtors stipulate that the Pre-Petition Loan Documents are genuine, valid, existing, and legally enforceable.

*Pre-Petition Claims*

23.     As of the Petition Date, the Debtors stipulate that, pursuant to the Pre-Petition Loan Documents and applicable law, K2 holds valid, enforceable, and allowable claims (the "Pre-Petition Claims") against the Debtors, in an aggregate amount equal to at least $25,937,215 (the "Pre-Petition Indebtedness") plus any and all other fees, cost, expenses, charges, other debts or obligations of the Debtors to K2 under the Pre-Petition Loan Documents and applicable law. Further, as of the Petition Date, the Debtors stipulate that K2 holds claims as assignee of certain Joining Creditors under the DRA. The Debtors' stipulate that K2 holds valid, enforceable and allowable claims in addition to the Pre-Petition Claims and the Pre-Petition Indebtedness, in the amount of at least $947,343 plus any and all other fees, costs and interest owed under applicable law.

24.     The Debtors stipulate that the Pre-Petition Claims and Pre-Petition Indebtedness constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of the Debtors, and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and that the Debtors do not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity,

enforceability and non-avoidability of any of the Pre-Petition Claims and Pre-Petition Indebtedness.

25.      The Debtors acknowledge that certain vendors took initial steps to file notices of mineral lien privileges (notices of statutory liens) under Louisiana state law against certain of the Debtors' properties.  The Debtors believe that these vendors did not properly perfect their interests, and therefore they either hold no valid liens or such liens are subordinate to K2 and without value.  Accordingly, the Debtors' believe that these entities are unsecured creditors except to the extent they benefit from the lien of the Creditors' Agent under the DRA. Notwithstanding, as adequate protection to any other secured creditor of the estates that may exist (including any secured creditor asserting mechanics', materialmen's, mineral or other statutory liens) for any diminution in value that may result from the Debtors' use of its respective Cash Collateral (and only to the extent such secured creditor holds a valid and perfected, non-avoidable lien and security interest in Cash Collateral as of the Petition Date (which the Debtors' deny), such secured creditor is granted (effective upon the Petition Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or otherwise), a replacement security interest and lien in the applicable Debtor's post-petition assets that are subject to its existing, prepetition liens and security interests with the same description, scope, validity, and priority as such prepetition liens and security interest held by such secured creditor on the Petition Date.  The Debtors reserve all rights to contest the validity, amount and priority of any and all claims, liens and security interests asserted by such secured creditors.[4]

*Pre-Petition Collateral*

---

[4] Further, K2 reserves all rights to contest the validity, amount and priority of any and all claims, liens and security interests asserted by creditors.

26.     The Debtors stipulate, except with respect to the ST 198 Lease, that the Pre-Petition Claims evidenced by the Pre-Petition Loan Documents are secured by perfected first priority liens and security interests in all property described in the Pre-Petition Loan Documents including, inter alia, all working capital and personal property assets of the Debtors (as more fully described in the Pre-Petition Loan Documents) including, without limitation, a pledge of all issued and outstanding equity of the Debtors, accounts, chattel paper, copyrights, patents, trademarks, documents, equipment, software, programs, peripherals, and other similar items related thereto, general intangibles, goods, fixtures, instruments, inventory, investment property, refunds, cash and cash equivalents, letters of credit, letter-of-credit rights and supporting obligations, deposit accounts, commercial tort claims; and accessions to, substitutions for, and replacements, proceeds (including stock rights), insurance proceeds, and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any general intangibles at any time evidencing or relating to any of the foregoing (collectively, the "Pre-Petition Collateral").  K2's liens and security interests in the Pre-Petition Collateral were granted pursuant to, inter alia, the Pre-Petition Loan Documents.

27.     The Debtors stipulate that K2 holds properly perfected first priority liens and security interests and other liens in the Pre-Petition Collateral (except with respect to the ST 198 Lease), the DIP Collateral (defined below), as evidenced by, among other things, the Pre-Petition Loan Documents, the DIP Loan (defined below), this Order, and documents held in K2's possession and documents filed with the appropriate state, county, and other offices.

*Pre-Petition Default*

28.     The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations to K2 under the terms and provisions of the Pre-Petition Loan Documents. The Debtors stipulate that these defaults exist, have not been timely cured, and are continuing. The Debtors stipulate that the Pre-Petition Claims were accelerated prior to the filing of this Case.  The Debtors further stipulate that the filing of this Case has accelerated the Pre-Petition Claims for all purposes in this Case and in connection with K2's enforcement of its rights and remedies under non-bankruptcy law.   Additionally, the Debtors stipulate that the Pre-Petition Claims remain due and owing to K2 without any claim, counterclaim, setoff, or defense of any kind, nature, or description.

**RELIEF REQUESTED**

29.     By this Motion, the Debtors seek to (a) use cash collateral on an interim and final basis; (b) to obtain Post-Petition secured financing (the "<u>DIP Loan</u>")[5], of approximately $1,600,000.00 depending on certain expenses of the Debtors, from The K2 Principle Fund L.P. (the "<u>DIP Lender</u>"), extending credit from time to time pursuant to the terms of a Financing Agreement to be finalized  between the Debtors and the DIP Lender (together with the related loan documents) (the "<u>DIP Agreement</u>") substantially in the form attached as **<u>Exhibit A</u>**; and (c) grant liens, administrative claims, and other adequate protection to K2 as more particularly set forth herein and as set forth in the proposed interim order, attached as **<u>Exhibit B.</u>**

30.     Accordingly, the Debtors request entry of an order approving the proposed Post-Petition Financing and request an order:

---

[5] Terms not specifically defined herein shall have the meanings subscribed to them in the DIP Agreement attached hereto as **<u>Exhibit A</u>**.

a.  Authorizing the Debtors, after a final hearing, pursuant to sections 364(b), 364(c), and 364(d) of the Bankruptcy Code, to obtain the DIP Loan pursuant to the DIP Agreement;

b.  Authorizing the inclusion of $404,354.95 in Pre-Petition Advances and $58,616.23 as payroll advanced on a post-petition basis as included in the DIP Loan;

c.  Authorizing the Debtors to use cash collateral and proceeds of the DIP Loan for the purposes set forth in the DIP Agreement and the budget attached as **Exhibit C**, including and subject to the limitations set forth in the DIP Order, for working capital, general corporate purposes, and payment of bankruptcy related expenses;

d.  Subject to the Carve-Out, granting superpriority claim status to the obligations under the DIP Agreement, pursuant to Section 364(c)(1) of the Bankruptcy Code, over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code, as limited by and set forth in the DIP Order;

e.  Granting the DIP Lender, pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority, perfected lien upon all of the Debtors' right, title and interests in, to and under all Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date, as more fully set forth in the DIP Order;

f.  Granting the DIP Lender, pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected lien upon all of the Debtors' right to, title, and interests in, to and under the Pre-Petition collateral as more fully set forth in the DIP Order;

g.  Modifying the automatic stay in certain respects in connection with such DIP Loan;

h.  Scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, pursuant to Bankruptcy Rule 4001; and

i.  Approving certain notice procedures for the interim and final hearings.

31.  Further, the Debtors seek authority to obtain Post-Petition secured financing (the "246 DIP Facility"), of approximately $10,000,000.00 from the DIP Lender, extending credit from time to time pursuant to the terms of a Financing Agreement to be finalized between the Debtors and the DIP Lender (together with the related loan documents) (the "246 DIP Credit

Documents") substantially in the form of the DIP Credit Agreement for the DIP Loan adjusted for the specifics of the EC 246 facility.

<em>Summary of Terms of the Proposed DIP Loan</em>

31.     After extensive negotiations, the Debtors and the DIP Lender are close to an agreement regarding the terms of the DIP Loan.  A summary of the terms of the proposed DIP Loan is provided below.  To the extent anything in the summary conflicts with the actual provisions of the DIP Agreement, the DIP Agreement shall control.  Parties are encouraged to read the entire DIP Agreement for complete and full understanding of the DIP Loan.

## 1.     **Initial Facility**

a.     **Pre-Petition Advances**:  $404,354.95 in Pre-Petition Advances and $58,616.23 in payroll advances as specified in the DIP Loan Agreement.

b.     **Amount of Facility**.  Up to $1,600,000.00 priming, superpriority loan as specified in the DIP Loan Agreement.  Post-Petition advances are to be in increments of at least $10,000.

c.     **Use of Financing**.  The DIP Loan will be used (i) to fund continuing operating expenses of the Debtors' incurred in ordinary course of business as set forth in the Budget and (ii) to pay other costs and expenses of the administration of the Debtors' bankruptcy cases; (iii) for working capital; and (iv) other general corporate purposes not in contravention of law or the DIP Loan Agreement, including certain payments of prepetition claims as may be approved by this court and consistent with the Budget.

d.     **Fees**.  The Debtors will pay a commitment fee of two percent (2%) of the principal amount of the DIP Loan.

e.     **Interest**.  Interest shall accrue at the fifteen (15%) percent per annum and be payable monthly.  After an Event of Default interest shall accrue at the rate of eighteen percent (18%) per annum.

f.     **Event of Default**.  The DIP Loan Agreement describes a number of customary Events of Default, including but not limited to payment default, violation of covenant, breach of representations or warranties, judgments, ERISA, labor and environmental.

g.   **Term**.  The DIP Loan matures on the earliest of (i) March 16, 2011; (ii) an occurrence of an Event of Default (the "Maturity Date"); or (iii) the date the DIP Lender is paid in full.

**h**.   **Security.**  All advances under the DIP Loan Agreement shall be secured by a first priority security interests in substantially all of the Debtors' tangible and intangible assets.

### 2.      East Cameron 246 DIP Facility

In order to perform the BOEM mandated refurbishment of its platform at EC 246 Lease

to maintain its lease, and to complete and tie in the EC 246 # 2 well, the Debtor has arranged for

a loan from K-2.  The 246 DIP Facility has the following terms:

a.   **Amount** - $10,000,000

b.   **Interest Rate** - 18%.

c.   **Commitment Fee** - 10% to be paid out of loan proceeds.

d.   **Payment Schedule** – All production attributable to the EC 246 lease net of actual operating expenses shall be paid to K-2 monthly and applied against the 246 DIP Facility.

e.   **Security** – A first priority, senior, priming lien, claim and mortgage under 364(d)(b) and (c) on the Debtors' interest in EC 246, and all products and proceeds thereof, and a super priority administration claim subject to the carve outs provided herein.  The DIP Credit Agreement will be in a form substantially similar to the Credit Agreement filed with this Motion and adjusted for the specifics of the EC 246 facility.

f.   **Other Provisions** – This DIP loan shall not come due on the Effective Date of the Debtors Plan, but will be carried forward as an exit facility, and the lien and claim against the Debtors on account of the EC 246 DIP loan shall not be affected by the confirmation any Plan and shall be paid pursuant to the 246 DIP Facility loan documents.

g.   **Proposed Funding** – The Debtor believes it will draw on the facility pursuant to 3 AFEs.  The amounts of the AFEs will be approximately:

    (i)      AFE 1 - $3,200,000
    (ii)     AFE 2 - $4,600,000
    (iii)    AFE 3 - $1,600,000

## GROUNDS FOR RELIEF

### A.    Interim Relief

32.    The Debtors bring the part of this Motion seeking the use of cash collateral on an expedited basis to avoid the immediate and irreparable harm described in the Gallatin Declaration that the Debtors will suffer if they do not obtain the necessary liquidity to sustain the business as a going concern.  The Debtors need immediate access to cash collateral and will need post-petition financing in the near future.

33.    Bankruptcy Rule 4001(b) and (c) provides that a final hearing on a cash collateral motion or a motion to obtain credit may not be commenced earlier than 15 days after service of such motion.  Upon request, this Court is empowered to conduct an interim expedited hearing on such motions at which time this Court may authorize the Debtors to use cash collateral and obtain credit to the extent necessary to avoid immediate and irreparable harm to their bankruptcy estates.  Pursuant to Bankruptcy Rule 4001(b) and (c) and for all reasons set forth herein, the Debtors request that this Court conduct an expedited interim hearing as soon after the Petition Date as this Court's schedule permits.

34.    The Debtors have determined that they have an immediate and critical need for the use of cash collateral.  With respect to the proposed DIP Loan, the Debtors have further determined that they will not be able to obtain alternative financing on terms superior to the terms of the DIP Loan, and such terms are market terms that represent the best terms reasonably available to the Debtors.

B.      **Legal Standards**

*Use of Cash Collateral*

35.      Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or release cash collateral unless (a) each entity that has an interest in such cash collateral consents or (b) the Court, after notice and hearing, authorizes such use, sale, or lease.[6]

36.      Pending a final hearing on the Motion, this Court may authorize the use of Cash Collateral if (a) such relief is necessary to avoid immediate or irreparable harm, including the threatened loss of business, and (b) the Debtors establish a reasonable likelihood of proving that the affected interest will be protected adequately.[7]

37.      If no diminution of value of the secured creditor's collateral through the date of the final hearing will occur and the debtor can operate profitably post-petition, the secured creditor is adequately protected against the use of its cash collateral by the debtor.[8]

*Approval of Post-Petition Financing*

38.      Section 364(d) of the Bankruptcy Code provides that if a debtor-in-possession is unable to obtain credit otherwise, and its pre-petition secured creditors are adequately protected, then a court may authorize post-petition financing supported by a superpriority lien:

> (d) (1)  The court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is purposed to be granted.[9]

---

[6] 11 U.S.C. § 363(c).
[7] *See, e.g.*, *In re Ames Dep't Stores*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990).
[8] *See In re Pursuit Athletic Foot Wear. Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (citations omitted).
[9] 11 U.S.C. § 364(d).

*Adequate Protection*

39.     The purpose of adequate protection is to ensure that a secured party's economic position is not worsened by the filing a bankruptcy case.[10]  A debtor has the burden to establish that the holder of a lien to be subordinated, or whose cash collateral will be used, has adequate protection.[11]  Adequate protection must be determined on a case-by-case basis, permitting a debtor maximum flexibility in structuring its adequate protection proposal.[12]  Where a debtor's purposed use of cash collateral augments the value of the secured creditor's collateral, adequate protection exist.[13]

40.     Activities of a debtor can enhance collateral value and thereby provide adequate protection.  Among the ways a debtor may demonstrate the existence of adequate protection is by supplying the pre-petition lender with additional or substitute collateral sufficient to compensate a secured creditor for a loss of value caused by the superpriority given to a post-petition loan.[14]

*Availability of Post-Petition Financing*

41.     Generally, Bankruptcy Code Sections 364(c) and (d) require a debtor to demonstrate the alternative sources of post-petition credit are not available.  Where few lenders, however, are likely able or willing to extend the credit required, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."[15]

---

[10] *In re DeSardi*, 340 B.R. 790, 204 (Bankr. S.D. Tex. 2006).
[11] *See In re Swedeland Dev. Co. Inc*., 16 at 3d 552, 564 (3d Cir. 1994) (citations omitted).
[12] *Id.*; *Martin v. United States Commodity Credit Corp. (In re Martin)*, 762 F.2d 472, 474 (8th Cir. 1985).
[13] *See, e.g.*, *Reconstruction Fin. Corp. v. Kaplan (In* re *Waltham Watch Co.)*, 185 F.2d 791, 797 (1st Cir. 1950) (use of cash collateral authorized under prior Bankruptcy Act to allow debtor to assemble watches out of tens of thousands of watch part were such increate the overall value of the debtor's assets); *In re Ledgemere Land Corp*, 125 B.R. 58, 62 (Bankr. D. Mass. 1991) (cash collateral use authorized where debtor's marketing efforts adequately protected creditor's interest and collateral through realization of fair market value rather than liquidation value); *In re Pine Lake Village Apt.*, 19 B.R. 819, 826 (Bankr S.D.N.Y. 1982) (creditor had adequate protection where debtor used cash collateral to maintain and preserve the value of the collateral).
[14] *See Swedeland*, 16 F.3d at 564 (citations omitted).
[15] *In re Sky Valley, Inc.,* 100 B.R.107, 113 (Bankr. N.D. Ga. 1998), *aff'd sub nom., Anchor Savings Bank FSB  v. Sky Valley, Inc.,* 99B.R.117, 120 n.4 (N.D. Ga. 1989).

**C.** **Need for Post-Petition Financing**

42.     The Debtors will need financing to continue operations to maintain the going concern value of their business.  The number of lenders who could commit to meet the Debtors' post-petition financing requirements is extremely limited and the Debtors' attempts to obtain alternative financing were unsuccessful or such efforts would be fruitless.  Given the Debtors' financial condition and existing financing arrangements, the Debtors have determined that they would be unable to obtain unsecured credit or other financial accommodations allowable as an administrative expense under section 503(b)(1).  As such, since no acceptable financing on more favorable terms is available, the only financing available and fair is the DIP Agreement reached with the DIP Lender.  In other words, DIP financing is not otherwise available to the Debtors without the protections afforded (a) pursuant to section 364(c) and subject to the Carve-Out granting superpriority status to those kinds of claims specified in sections 503(b) and 507(b); and (b) pursuant to sections 364(c) and 364(d), securing such obligations with security interest and liens on all of the Debtors' assets (*i.e.,* the "DIP Collateral").

43.     In the exercise of their business judgment, the Debtors have determined that the terms of financing proposed by the DIP Lender are the most favorable available under the circumstances.  This fact is particularly true given (a) the nature of the Debtors' business, which will be adversely impacted by any prolonged stay in chapter 11;  (b) reduced liquidity in the financial markets; (c) the delay and cost attendant to soliciting proposals from new lenders, which would require additional due diligence and related fees; (d) the unsuccessful attempts at securing alternative financing from other sources; (e) that the Debtors cannot survive through the use of unencumbered property (as non-exist) or the use of cash collateral; and (f) that any effort to bring in alternative debtor-in-possession financing will entail a "priming fight" that would be expensive, a distraction for the Debtors' management and involve litigation risk.  Further, the

knowledge the DIP Lender possesses about the business has permitted an abbreviated due diligence period.

44.      The Debtors have further determined that, in the exercise of their business judgment, they are negotiating the best financing arrangement that they can reasonably expect under the circumstances.  The fees are customary and reasonable, and courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in Section 364.[16] Moreover, the alternatives are dire; without additional liquidity, the Debtors cannot continue operations and will be forced to dismiss these cases or convert to chapter 7.

45.      Under the circumstances, the Debtors' exercise of business judgment is entitled to deference by this Court.[17]  Based on the foregoing, the Debtors request that at a final hearing on this Motion this Court approve the DIP Loan in accordance with the DIP Agreement.

**D.      Need for Cash Collateral**

46.      In addition to the later need for debtor-in-possession financing, the Debtors' immediate pressing concern is the need for use of K2's cash collateral.  The Debtors require the use of cash collateral to be able to pay their normal, general and administrative expenses, satisfy payroll and employee benefits, pay taxes, and pay vendors to ensure a continued supply of services and material essential to the debtors continued viability.  Cash collateral will not be used for any Capex, including without limitation, drilling, payment for seismic or payments to extend or renew leases.

---

[16] *See In re Defender Drug Stores, Inc.*, 145 B.R.312, 316 (9th Cir. BAP 1992).

[17] *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that under Bankruptcy Code § 364, courts have considerable discretion to permit Debtors to exercise reasonable business judgment provided of the terms of the financing do not "leverage the bankruptcy process and powers" and that the purpose of the financing is primarily to benefit the estate).

E.      **Adequate Protection**

47.      The Debtors' only creditor with an interest in cash collateral is K2, who is also the DIP Lender. Debtors' propose as adequate protection for K2, pursuant to Section 361 and 363(e) of the Bankruptcy Code, for adequate protection of its interests in the Prepetition Collateral on account of the Debtors' use of the Cash Collateral to the extent it results in a decrease in value of such interests (the "Diminution in Value"). As adequate protection to K2 for the aggregate Diminution in Value, K2 shall be and hereby is granted (effective upon the Petition Date and without the necessity of the execution or filing by the Debtors or K2 of mortgages, security agreements, pledge agreements, financing statements, or otherwise), the following (the "Adequate Protection Obligations"), subject to, in each case, the Carve Out (defined below):

a.      Adequate Protection Liens.  To the extent of Diminution in Value, to the same extent and in the same priority as may be validly held by K2 as of the Petition Date, K2 shall have and is hereby granted (effective as of the Petition Date), valid and automatically perfected replacement security interests and liens (the "Replacement Liens") in and upon all of the property and assets that are included within the definition of their Prepetition Collateral, as may be created, acquired received, and/or obtained post-petition, each such liens having the same validity and priority, and being of the same extent with respect to all such property as existed on the Petition Date.

b.      Superpriority Claims.  To the extent of Diminution in Value, K2 shall have an allowed superpriority administrative expense claim in the amount of such insufficiency as provided in and to the full extent allowed by Sections 503(b) and 507(b) of the Bankruptcy Code (the "Cash Collateral Superpriority Claims"); provided, however, the Cash Collateral Superpriority Claims shall not attach to proceeds or recoveries from Chapter 5 causes of action.  The Superpriority Claims shall be allowed claims against each Debtor (jointly and severally).

c.      Right to Credit Bid.  K2 shall have the right to credit bid the Pre-Petition Indebtedness in the amount of K2's allowed secured claim at the time of any such bid in connection with any sale or exchange of the Pre-Petition Collateral or DIP Collateral, regardless of whether such sale or exchange takes place inside or outside of a plan of reorganization, which right shall be in addition to and shall supplement their right to credit bid as it may exist under the Pre-Petition Loan Documents and applicable law.

48.     The Creditors' Agent under the DRA has a security interest in certain Cash Collateral subordinate to K2, but the value of the Debtor's assets are less than K2's Pre-Petition Claims.  Therefore, the Creditors' Agent is not entitled to adequate protection.  The Creditors' Agent has senior security interest in the ST 198 Lease; however the ST 198 Lease is not producing.  The Debtors do not believe that any purported statutory lienholders are entitled to adequate protection as these parties failed to properly perfect their interests.[18]  Without valid liens, they are unsecured creditors and unsecured creditors are not entitled to adequate protection.[19]  Regardless, of perfection, the value of the Debtors' assets, on which K2 holds a senior lien, is substantially less than amount of K2's Pre-Petition Claims.  As such, the claims of any and all junior lienholders are worthless.   Valueless junior secured positions or unsecured deficiency claims are not entitled to adequate protection.[20]

49.     Notwithstanding, as adequate protection to any other secured creditor of the estates that may exist (including any secured creditor asserting mechanics', materialmen's, mineral or other statutory liens) for any diminution in value that may result from the Debtors' use of their  respective Cash Collateral (and only to the extent such secured creditor holds a valid and perfected, non-avoidable lien and security interest in Cash Collateral as of the Petition Date (which the Debtors' deny)), such secured creditor is granted (effective upon the Petition Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or otherwise), a replacement security interest and lien in the applicable Debtor's post-petition assets that are subject to their  existing, prepetition liens and

---

[18]  *In re Hawkins*, 224 B.R. 334 (Bankr. E.D. La. 1998) (An entity is not entitled to protection of its interests if its interests are somehow defective under non-bankruptcy law).

[19]  *Chama, Inc. v. First N. Bank & Trust (In re Chama, Inc.),* 265 B.R. 662, 669 (Bankr. D. Del. 2000) ("Since the Bank's security interests are avoided, it is a general unsecured creditor.  It is therefore not entitled to any adequate protection.").

[20]  *See In re T.H.B. Corp.*, 85 B.R. 192, 197 (Bankr. D. Mass. 1988); *In re Lopez-Soto,* 764 F.2d 23, 26 (1st Cir. 1985)("valueless junior secured positions or unsecured deficiency claims will not be entitled to adequate protection").

security interests with the same description, scope, validity, and priority as such prepetition liens and security interest held by such secured creditor on the Petition Date.  The Debtors (and K2) reserve all rights to contest the validity, amount and priority of any and all claims, liens and security interests asserted by such secured creditors.[21]

50.      As adequate protection for the Debtors' use of cash collateral and the DIP Loan proceeds, the Debtors propose to grant K2 replacement liens in the Pre-Petition Collateral as set forth in the Interim Order.  The Debtor does not propose to grant K2 liens in avoidance actions under Chapter 5 of the Bankruptcy Code.  Additionally, the replacement liens will be subject to a carve-out in the amounts agreed to by the Debtors and the DIP Lender and as set forth in a budget agreed to with K2.

51.      Second, the Debtors will provide K2 with ample information relating to projected revenues and expenses, actual revenues and expenses, and variances from the budget.  This information will enable K2 to monitor its interest in the collateral and cash collateral. Reporting of financial information can also be sufficient form of adequate protection.[22]

52.      Third, the Debtors propose to adequately protect K2 with the maintenance and potential increase in value of the Pre-Petition Collateral.  The Debtors intend to use cash collateral and the DIP Loan proceeds to maintain K2's collateral.  Because adequate protection is "broad and flexible," it can be satisfied by improvements to collateral.[23]

**F.**      **Approval of the Waiver of Automatic Stay**

53.      Section 362 provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Loan contemplates that the DIP Lender shall have a first priority lien on all of

---

[21] Further, K2 reserves all rights to contest the validity, amount and priority of any and all claims, liens and security interests asserted by creditors.

[22] *In re Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's Inc.)*, 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992).

[23] *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631-32 (Bankr. S.D.N.Y. 1992).

the Debtors' assets.  To the extent necessary, the DIP Lender should be granted relief from the automatic stay to perfect such interest.

54.     Stay modification provisions of this kind are ordinary and standard features of post-petition, debtor-in-possession financing facilities and, and in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Debtors respectfully request that this Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim DIP Order.

**G.     Good Faith**

55.     The terms and conditions of the DIP Agreement are fair and reasonable.  The Debtors and the DIP Lender negotiated in good faith and at arms length at all times regarding such terms and conditions.  The parties engaged in extensive negotiations concerning the DIP Loan.  Also negotiated were the parameters of the budget and the terms of the current First Day Motions that will require the use of cash collateral.

56.     In light of the foregoing, the DIP Lender should be accorded the benefits and protections of Section 364(e) with respect to the DIP Loan.  Specifically, any loans, advances or other financial accommodations that the DIP Lender makes are costs to be paid from time-to-time to the Debtors on the terms and conditions set forth in the DIP Agreement, should be deemed to have been made and provided in "good faith" as the term is used in Section 364(e), and shall be entitled to the full protection of the Bankruptcy Code in the event that the orders or any provisions are hereafter modified, vacated, amended or stayed by subsequent order of this Court or any other court without the express consent of the DIP Lender.

**H.     Waiver**

57.     This Court should approve the Debtors' waiver in the order of any right to surcharge the DIP Collateral.  Such waivers and provisions are standard and customary under

financing between sophisticated parties such as the Debtors and the DIP Lender.  As one court noted that in discussing the later enforceability of such waivers, "the Trustee and Debtor-in-Possession in this case has significant interest in asserting claims under Section 506(c) and have made their rights against the Lender under 506(c) by waiving them in exchange for concessions to the estate (including the substantial Carve-Out for the benefit of the administrative creditors)."[24]

58.     The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from a Carve-Out.  Under the DIP Loan, the Debtors agree to waive any rights to charge cost expenses against the DIP Lender Collateral *except* for the Carve-Out. In other words, the Debtors have waived the uncertainty of surcharge rights in exchange for the valuable and predictable rights granted to the Debtors' other estate professionals under a Carve-Out.[25]

### Final Hearing Date

59.     The Court has set a final hearing on a request for authority to use cash collateral or and/or a request for approval of post-petition financing scheduled for January 13, 2011 at 2:00 p.m. in the United States Bankruptcy Court for the Southern District of Texas, Bob Casey United States Court House, 515 Rusk Street, Courtroom 403 – 4th Floor, Houston, Texas 77002 for this Court to consider final approval of the Debtors' use of Cash Collateral and the DIP Loan.

---

[24] *In re Molton Metal Tech Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *see also In re Nutrition System of Florida Assoc.*, 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived section 506(c) rights in obtaining debtor-in-possession financing); *cf. In re Telesphere Comm'n. Inc.*, 179 B.R. 544, 549 (Bankr. N.D. Ill., 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

[25] *Cf. In re Lunan Family Restaurant Ltd. P'ship*, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable and (3) the secured creditor was the party primarily benefited by the expenditure]." (citing *In re Flagstaff*, 739 F.2d 73, 77 (2d Cir. 1984))); *New Orleans Public Service Inc. v. Delta Towers Ltd. (In re Delta Towers)*, 112 B.R. 811, 815 (E.D. La. 1990), *rev'd on other grounds. sub nom.*, *In re Delta Towers*, 924 F.2d 74 (5th Cir. 1991).

## PRAYER

**WHEREFORE**, the Debtors request entry of an order granting the requested relief herein and such other and further relief as this Court may deem proper, both at law and in equity.

December 29, 2010

/s/ Douglas S. Draper
Douglas S. Draper (LA Bar No. 5073)
William H. Patrick, III (LA Bar No. 10359)
Leslie A. Collins (LA Bar No. 14891)
**Heller, Draper, Hayden, Patrick & Horn, LLC**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
Telephone: (504) 299-3300
Facsimile: (504) 299-3399
E-mail: ddraper@hellerdraper.com
E-mail: wpatrick@hellerdraper.com
E-mail: lcollins@hellerdraper.com

*Attorneys for the Debtors and*
*Debtors-in-Possession*

EXHIBIT A

[To be filed]

EXHIBIT B

[Previously filed]

EXHIBIT C

[To be filed]